The STATE of Ohio, Appellant,

v.

DAVIS, Appellee.

[Cite as *State v. Davis* (1992), 80 Ohio App.3d 277.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 60039.

Decided May 18, 1992.

*Stephanie Tubbs Jones*, Cuyahoga County Prosecuting Attorney, and *Nancy McDonnell*, Assistant Prosecuting Attorney, for appellant.

*Albert A. Giuliani*, for appellee.

KRUPANSKY, Judge.

The state of Ohio appeals from an order of the trial court granting defendant's motion to suppress evidence. The relevant facts follow.

Defendant, Jeffrey D. Davis, and two others, Lavender and Brown, were indicted by the Cuyahoga County Grand Jury on a three-count indictment, *viz.*, count one, R.C. 2925.03, drug law, possession of cocaine in an amount equal to or exceeding the bulk amount; count two, R.C. 2925.03, drug law, preparation of cocaine for shipment or distribution; and count three, R.C. 2923.24, possession of criminal tools. All the charges arose out of an incident which occurred on October 31, 1989. On that date, members of the Cleveland Police Department went to 631 East 97th Street (down), Cleveland, Ohio, with the alleged purpose to execute an outstanding arrest warrant for defendant

Davis. Defendant Davis and the two other defendants were arrested on that date and the officers at that time recovered from the residence and the car of one of the arrestees a significant amount of money and other articles associated with drug activity. Prior to their trial, all three defendants moved to suppress the evidence recovered. The trial court held a hearing on the motion. After the hearing, the trial court overruled the motion to suppress pertaining to Lavender and Brown and sustained the motion in the case *sub judice* on the ground defendant Davis had an "expectation of privacy" in the premises. The following testimony was elicited at the hearing.

Detective Amos Floyd, an undercover agent for the Cleveland Police Department's Sixth District Strike Force, testified that he was on duty the day of October 31, 1989 investigating a felonious assault perpetrated upon defendant Davis.[1] Davis had given as his address 631 East 97th Street in connection with that case. In the course of his investigation that day, Detective Floyd became aware that there was an outstanding arrest warrant from June 1989 for defendant Davis for carrying a concealed weapon. Floyd was about to go off duty, so he gave the information to another detective in the unit, Detective Haynesworth.

Detective Haynesworth testified he had received information from Detective Floyd that there were arrest warrants for defendants Davis and Lavender and others who were members of a gang known as the "Survivors." Detective Haynesworth testified that several members of this gang were being investigated in connection with drug sales, felonious assault shootings, and attempted murder. He further testified that the police "had received a phone call that Jeffrey Davis had some time that day been released from the hospital, and that he was on his way home, and that location was—the location of the home, 631 East 97th." Detective Haynesworth testified that upon receipt of the above information, he and as many as ten other policemen, some in uniform, went to that address to effect an arrest. However, he did not have any arrest warrants with him.

Detective Haynesworth testified that upon arriving at the house he and a uniformed police officer, Brinkhoff, went onto the porch and knocked at the outside screen door, announcing "police." He stated he was positioned so he could see through a window into the house and at that point he observed a pregnant woman, later identified as Regina Kirkman, with a baby come through the foyer door, which was open, and approach the inside door, which was not fully closed. Officer Brinkhoff said "police" again and "she muttered

---

1. It was stated that Davis had suffered a gunshot wound to the eye that required hospitalization.

something." Detective Haynesworth said it was announced, "police, we're coming in." Thereupon, the woman picked up the baby. Detective Haynesworth further testified she "muttered something . . . yes was what I took it to be," and started "back stepping out the front area." The officers then entered the residence with their guns drawn.

The woman was apparently still backing away. Detective Haynesworth testified her actions caused him to have some concern that something was wrong, *i.e.*, he was concerned about the officers' safety. He also testified that as they entered the home he saw defendant Davis exit the kitchen doorway with a brown paper bag in his arms. When the detective reached the kitchen he observed Davis no longer had the bag and was standing almost in front of the door which led to the basement.

At this point, Detective Haynesworth testified, the officers were inside the kitchen. He further testified from this vantage point he could see into one of the bedrooms and noticed a different young woman. However, he believed there were still some people "missing." Therefore, he and Officer Brinkhoff moved toward the other bedroom and he then heard some "clicking sounds" and what sounded to him "like a weapon being chambered."

He testified he then pushed the bedroom door open and saw a man in the bedroom with his arms "open" near a partially opened dresser drawer. He stated he told the man, later identified as defendant Lavender, to keep his hands where they could be seen, handcuffed him and then looked into the dresser drawer. Therein he saw (1) a Max Eleven semi-automatic pistol with the barrel extension off and magazine out, which had one live round in the chamber; (2) a "rather large amount" of money; and (3) some narcotics. Detective Haynesworth stated he also saw a .357 magnum revolver inside a clothes basket on the floor in front of Lavender.

Detective Haynesworth stated he then asked for names from the people that had been thus far discovered in the house. He stated that upon learning Davis' name he informed Davis he had a "warrant for felonious assault for him."

Detective Haynesworth further testified that at that time the officers seated everyone in the living room; he noticed the "lady with the baby that was at the door" was still missing. Two officers were thereupon sent to the basement. Officers were also sent upstairs to look for her. The woman was eventually found hiding in the attic of the house with her baby. She was then brought downstairs. In the basement was found a brown paper bag with packages of cocaine inside.

Detective Haynesworth testified he then told the woman, Regina Kirkman, why the police were there and asked her if she was the lessee of the house. Upon her assent, he testified he stated to her the following:

"I found the guns in your bedroom and there are some narcotics in your bedroom. Now, I said, I can't take the narcotics legally and charge anybody with them, I said, but it could be done this way, I said there is [sic] two ways or two options that we have to have to do it; no. 1 is we wait for a search warrant and we take everything here, and then we find out from the prosecutor's office who gets charged accordingly, or you can sign a consent to search and we will take the items out of your house."

He further testified as follows:

"At that point I gave her her constitutional rights. Then I called for a boss. Then she turned around and told me, well, I don't want the stuff here, I don't give a shit what it is. And those were her exact words. I don't want it here, I don't have anything to do with it, and I don't know what it's doing here.

"I told her, I said, well, in order for us to take it out, we can just take it, I said, but the point of it is, you know, to me, if I just take it, this way I lose my case. I will go get a search warrant and come back. She said, if you want me to sign anything, I will sign it. At that point I gave her that consent to search form and explained to her what it was."

Detective Haynesworth testified Kirkman then signed the consent form. Then he showed her what was found and where the different things were located. He stated she then asked him some questions regarding police procedures. Subsequently, Kirkman signed the consent to search form again. The officers thereupon conducted a further search of the premises and finished the inventory of the items found. The consent form indicated the house was entered by the police at 8:30 p.m. and that the officers left at approximately 11:30 p.m.

Detective Haynesworth's testimony concerning the details of the incident was corroborated by three other officers involved in the execution of the arrest warrant, *viz.*, Officer Glover, Officer Brinkhoff and Detective Floyd. However, his testimony was in some particulars contradicted by the testimony of Kirkman and her roommate, Devonna Martin.

Martin testified she had lived with Kirkman for about two months prior to October 31, 1989. She testified that on that day she had picked up the defendant at the hospital and brought him back to the house. She testified the police arrived at approximately 8:30 p.m.; however, she did not hear a knock at the door, nor did she hear the officers announce why they were there. She testified that the police officers spent about two and one-half

hours searching the residence, but did not find Kirkman until the end of that time period. Furthermore, in response to the question:

"Did you overhear the police say anything to Miss Kirkman to induce her to sign this piece of paper?"

Martin stated the following:

"They told her they would take me down to fifth district, take her son to Metzenbaum and take her to jail if she didn't sign those papers."

Martin also contradicted the officers' testimony with regard to defendant Lavender, stating he was in the bathroom when the police entered the house. Furthermore, she stated defendant Davis never had a brown paper bag in his hands during the incident, never went down to the basement, and that the officers searched the basement "four or five times" before they found the bag.

With regard to her relationship with defendant Davis, Martin testified Davis was her boyfriend and that he would come over to the residence at 631 East 97th Street "three or four times a week" and stay overnight. She stated that he kept some clothing at the house; however, she testified that Davis did not live at 631 East 97th Street. Furthermore, upon cross-examination, she agreed that Davis' home address was 2339 East 90th Street, and also agreed that address was where he received his mail, kept all his belongings, and paid the bills. She further agreed Davis had not been at 631 East 97th Street for the week prior to October 31, 1989, since he had been hospitalized. There was no testimony as to what Davis' intentions with respect to sleeping arrangements were on the night in question. Furthermore, in response to the prosecutor's questions, Martin also admitted guns were found in Kirkman's bedroom and that in her bedroom the police discovered a safe containing "sixty-six [sic] thousand dollars."

Regina Kirkman also testified at the hearing on defendants' motion to suppress evidence. She testified that on the evening in question she heard the knock and the announcement "Cleveland Police." To the question, "And what did you do in response to that?" she testified, "I'm like, yeah, right, by it being Halloween, I didn't believe it was the police, I just thought it was kids trick or treating." She testified she went toward the door, then saw the police officers. She did not remember whether the door was open or not. She stated that upon seeing the officers she backed toward the kitchen and saw Davis and defendant Lavender "in the bedroom" and asked why the police were there. She testified that at that point she went with her baby upstairs to the attic. She testified that although she didn't have a watch on, she believed she was hiding for "at least two hours." She testified that when she finally was brought back downstairs, her house had already been "ram-

shacked [*sic* ]" by the officers, and all the items on the inventory had already been found. On direct examination, the following question and response were exchanged:

"Q. Now, when the police officers showed you this form, what did they say to you?

"A. I had two choices, either to sign the form and I wouldn't go to jail and my name wouldn't be in anything, or either not sign the form, my baby get taken to Metzenbaum, and I get put in jail."

However, shortly thereafter, still on direct, Kirkman's testimony was as follows:

"Q. Let me rephrase that. The two police officers told you that they would arrest you if you did not sign this, is this correct?

"A. Yes.

"Q. And they further stated that you would go to jail and your child would go to the Metzenbaum Center if you did not sign that; is that a correct statement?

"A. Yes.

"Q. And those are the reasons you signed this, is that correct?

"A. *I didn't mind signing that form* for the simple fact I didn't know the stuff was in my house, so I gave them permission to take the stuff out of my house." (Emphasis added.)

Kirkman also stated on direct examination she read the consent form before she signed it.

After hearing all the testimony, the trial court concluded defendant Davis had demonstrated he had a privacy interest in the premises sufficient to challenge the lawfulness of the search. The state now appeals from that order, citing three assignments of error for review.

■ The state's first assignment of error follows:

"The trial court erred in granting the motion to suppress as defendant Davis did not have standing to challenge the motion to suppress."

This assignment of error has merit.

The state argues the defendant failed to produce sufficient evidence to prove that the residence searched was a place where the defendant had a "reasonable expectation of privacy." Therefore, the state asserts since defendant "did not have a legitimate expectation of privacy in the residence located at 631 East 97th Street, he does not have standing to challenge any alleged misconduct by law enforcement officers."

Defendant argues that because he was a sometime resident at the house, due to his relationship with Devonna Martin, he had a reasonable expectation of privacy in the premises as guaranteed by the Fourth Amendment. However, defendant's argument is unpersuasive.

Regarding this issue, this court has stated the following:

"The Fourth Amendment right to be free from unreasonable searches and seizures cannot be vicariously asserted. In order to challenge a search or seizure on Fourth Amendment grounds, a defendant must possess a legitimate expectation of privacy in the area searched, and *the burden is upon the defendant to prove facts sufficient to establish such an expectation.* [Citations omitted.]

" * * *

" * * * The mere assertion of a proprietary interest in the premises searched, standing alone, is insufficient to prove the fact of appellant's ownership. Appellant cannot simply assert such an interest and then fail to produce any evidence in support thereof, where the burden of proof is placed upon appellant." (Emphasis added.) *State v. Steele* (1981), 2 Ohio App.3d 105, 107, 109, 2 OBR 118, 122, 440 N.E.2d 1353, 1356; *State v. Chandler* (Mar. 5, 1992), Cuyahoga App. No. 59764, unreported, 1992 WL 41856.

Defendant relies on the recent United States Supreme Court decision, *Minnesota v. Olson* (1990), 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85, in support of his contention. Therein, the court stated as follows, *id.* at 95–96, 110 S.Ct. at 1687, 109 L.Ed.2d at 92:

"Since the decision in *Katz v. United States,* 389 U.S. 347 (1967) [88 S.Ct. 507, 19 L.Ed.2d 576], it has been the law that 'capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.' *Rakas v. Illinois,* 439 U.S. 128, 143 [99 S.Ct. 421, 430, 58 L.Ed.2d 387, 400] (1978). A subjective expectation of privacy is legitimate if it is ' "one that society is prepared to recognize as 'reasonable,' " ' *id.,* at 143–144, n. 12 [99 S.Ct. at 430–431, 58 L.Ed.2d at 400–402], quoting *Katz supra* [389 U.S.], at 361 [88 S.Ct. at 516, 19 L.Ed.2d at 587] (Harlan, J., concurring)."

In *Olson,* police officers acting on a tip went to a two-family residence where a robbery suspect might be located. Upon their arrival, the officers questioned the woman who lived downstairs, who was the grandmother of the suspect's girlfriend. The woman "confirmed that a Rob Olson had been staying upstairs but was not then in the unit." *Id.,* 495 U.S. at 94, 110 S.Ct. at 1686, 109 L.Ed.2d at 91. When the suspect returned, the police first verified he was there by telephoning the upstairs unit, then "[w]ithout seeking

permission and with weapons drawn, the police entered the upper unit and found respondent hiding in a closet." *Id.* In the state courts, defendant successfully challenged the admission of inculpatory statements he made subsequent to his arrest, and the decision of the Minnesota Supreme Court was affirmed.

The United States Supreme Court stated its rationale thusly:

"We need go no further than to conclude, as we do, that Olson's *status as an overnight guest* is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." (Emphasis added.) *Id.* at 96–97, 110 S.Ct. at 1687–1688, 109 L.Ed.2d at 92–93.

However, in the *Olson* case, defendant presented sufficient evidence that he had been staying overnight at the residence in question for some time previous to the police arrival. In contrast, in the case *sub judice*, at the hearing on the motion to suppress, although defendant did not testify, defendant asserted that he had been an overnight guest in the past at the house at 631 East 97th Street but failed to produce any evidence regarding the evening in question. Rather, the evidence adduced at the hearing tended to show defendant's place of residence was at another address. Moreover, although defendant had stayed overnight with Martin occasionally, he had not done so for at least a week prior to October 31, 1989 and there was no evidence that he planned to stay overnight on that particular night. On facts such as these, this court is not prepared to say defendant "had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Id.*

Upon a review of the record, it is clear that this is the ground upon which defendant's motion to suppress was granted. At the conclusion of the hearing on the motion, the trial court stated as follows:

"[D]efendants Brown and Lavender were there on the premises * * *. They are obviously identified as people who did not own [or] lease the premises who were there.

"And that the evidence presented in this case is of such a nature that the defendant, Davis, would have a higher interest in that property in regards to the fourth amendment, and that he therefore would have standing regarding the search which is here.

"But in regards to the search, I'm satisfied that the police department, at the time of the searching of these premises, had, as one officer said, a reasonable expectation or reasonable probability that there was [*sic*] guns and money and illegal activity being conducted.

"* * * *

"[T]he officers, upon arriving at the scene, they did have a valid search warrant, and in the pursuit—not search, but valid arrest warrant, but in executing the valid arrest warrant, they had the right to protect themselves and to search that area, wherein, as the testimony uniquely showed in this case, not only to search for weapons, but also in this case to search for missing people, and therefore protective sweep in response to the execution.

"Arrest warrant is sufficient, and I also specifically find that in regards to the defendants Brown and Lavender, that they do not have the necessary factual basis upon which they can assert any type of standing to avail themselves of the protections of the fourth amendment. Therefore, the motion to suppress in regards to the defendant, Davis, is granted, and the motion to suppress in regards to the defendants Brown and Lavender is denied."

Therefore, it is clear the trial court granted defendant's motion to suppress on the specific ground that defendant had established the search of the house at 631 East 97th Street on October 31, 1989 implicated his Fourth Amendment rights. Consequently, the trial court erred in granting the motion to suppress, since it determined defendant had standing to challenge the search based upon an "expectation of privacy" in the premises; however, defendant's evidence was insufficient to enable him to challenge the lawfulness of the search on this ground. *State v. Steele, supra.*

Accordingly, the state's first assignment of error is sustained.

The state's second assignment of error follows:

"The trial court erred in granting the motion to suppress as the police properly executed an arrest warrant."

This assignment of error has merit.

The state argues the police were validly at the premises of 631 East 97th Street pursuant to an arrest warrant for Davis and their actions once they arrived at the premises were proper. The state's argument is persuasive.

■ At the hearing on the motion to suppress, defendant argued the police failed to comply with R.C. 2935.12 in executing the arrest warrant. R.C. 2935.12 states in pertinent part the following:

"(A) When making an arrest or executing an arrest warrant or summons in lieu of an arrest warrant, * * * the peace officer, law enforcement officer, or other authorized individual making the arrest or executing the warrant or summons may *break down* an outer or inner door or window of a dwelling house or other building, *if, after notice of his intention to make the arrest or to execute the warrant or summons, he is refused admittance* * * *."
(Emphasis added.)

In the case *sub judice*, Detective Haynesworth had knowledge of an outstanding valid arrest warrant for defendant Davis. He testified this information was obtained from Detective Floyd. Moreover, he testified he verified the information. Although he did not accurately remember what the warrant was for by the time of the hearing on the motion to suppress, that does not in itself render the officer's action improper.

"So long as 'the law enforcement system as a whole has complied with the Fourth Amendment' and possesses facts adding up to probable cause, the arrest will be valid even though the arresting officer alone does not possess these facts. [Citations omitted.]" *State v. Henderson* (1990), 51 Ohio St.3d 54, 57, 554 N.E.2d 104, 107.

In the case *sub judice*, therefore, the police knew there was a valid warrant for the arrest of Davis. Moreover, Davis had given information to the police in connection with another case that gave them probable cause to believe defendant might be located at 631 East 97th Street. They went to that location. Once there, however, the testimony indicates R.C. 2935.12 became irrelevant.

The officers testified they knocked at the door and announced themselves; a woman was coming to answer the door, which was partially open. When she saw who was at the door, she "muttered something" and started quickly backing away, a natural movement when permitting entrance or extending an invitation to enter. Although the officers further testified they could not at the time of the hearing recall whether they announced *why* they had come to the premises, or even if they had an opportunity to so announce their intentions, the facts of the case thus do not indicate compliance with R.C. 2935.12 was necessary. The officers neither used force to make their entry nor were they "refused admittance." No breakdown of an outer or inner door or window was necessary under the circumstances herein.

The state contends that the officers' actions were reasonable under the holding of *State v. DeFiore* (1979), 64 Ohio App.2d 115, 18 O.O.3d 90, 411 N.E.2d 837, *i.e.*, the facts of the case indicate circumstances "upon which a reasonable belief could be founded that suspected occupants * * * would be armed or dangerous, an exigent circumstance" that justifies a forcible entry.

"If it appears that the evidence sought can and will be destroyed on short notice, *or that compliance could place the officers in peril of great bodily harm, then the officers may deviate from strict compliance with R.C. 2935.12.*" (Emphasis added.) (Citations omitted.) *State v. Roper* (1985), 27 Ohio App.3d 212, 213, 27 OBR 252, 253, 500 N.E.2d 353, 354; cf. *Middleburg Hts. v. Theiss* (1985), 28 Ohio App.3d 1, 28 OBR 9, 501 N.E.2d 1226.

However, since there was no forcible entry, there is no need for this court to address this contention.

■ Moreover, once inside the house, the police are justified in making a "protective sweep" of the premises to ensure their own safety. *Maryland v. Buie* (1990), 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276. As the United States Supreme Court stated in *Maryland v. Buie, supra,* at 327, 110 S.Ct. at 1095, 108 L.Ed.2d at 281:

"We conclude that the Fourth Amendment would permit the protective sweep undertaken here if the searching officer 'possesse[d] a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]" the officer in believing,' *Michigan v. Long,* 463 U.S. 1032, 1049–1050 [103 S.Ct. 3469, 3480–3481, 77 L.Ed.2d 1201, 1219–1220] (1983) (quoting *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905] (1968)), that the area swept harbored an individual posing a danger to the officer or others."

The officers in the case *sub judice* testified the gang with which defendant was associated was known as "shooters," *i.e.,* people who did not hesitate to fire weapons. The house was known for drug activity. The officers had no idea how many people were in the house, and the woman who had initially come to the door was "missing." These are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger."

■ During the protective sweep, the officers came upon incriminating evidence that was in plain view. If the initial entry is proper, the evidence can then be lawfully seized. *Maryland v. Buie, supra.* See, also, *State v. Williams* (1978), 55 Ohio St.2d 82, 9 O.O.3d 81, 377 N.E.2d 1013; *State v. Jemison* (1968), 14 Ohio St.2d 47, 53, 43 O.O.2d 115, 118, 236 N.E.2d 538, 541.

■ Since the police in the case *sub judice:* (1) were validly on the premises to execute the arrest warrant for Davis; (2) were not refused admittance to the residence; and (3) did not have to break down the door to enter, their entry was not improper. Accordingly, the state's second assignment of error must be sustained.

The state's third assignment of error follows:

"The trial court erred in granting the motion to suppress as the leaseholder signed a consent to search form."

This assignment of error has merit.

The state argues the totality of the circumstances in the case *sub judice* indicates consent to search was voluntarily given by Kirkman. This argument is persuasive.

■ Warrantless searches based upon consent are valid if, *in view of the totality of the circumstances,* consent to the search is voluntarily given. *State v. Danby* (1983), 11 Ohio App.3d 38, 11 OBR 71, 463 N.E.2d 47. Voluntariness is a question of fact to be determined from all the circumstances. *Id.,* citing *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854.

■ In the case *sub judice* the totality of the circumstances indicates consent to the search was voluntarily given. The police were executing a valid arrest warrant. They conducted a "protective sweep" of the premises. Kirkman was missing. The police then searched for her and, as she admitted, she did not have a watch so she did not know how long she had been hiding in the attic. Once she was brought downstairs, Detective Haynesworth informed her that without her consent to search the residence he would have to obtain a search warrant, which meant that some time would be involved. He testified she asked him questions. It is reasonable to assume that the explanation he gave to her consisted of *his* choices: without her consent, in view of the circumstances and the time involved in obtaining a search warrant, he would have to place her under arrest and, since the officers had no other facilities for her child, the child would have to be placed somewhere, such as "the Metzenbaum home." This does not qualify as "coercion" such as to vitiate her signature on the consent form, especially in view of her testimony that she "didn't mind" signing the form, in addition to the following testimony elicited upon cross-examination:

"Q. Now, State's, or excuse me, Defendant's Motion Exhibit B, looking at that, this is your signature, right? You did read all this information before signing it, right?

"A. Right.

"Q. And the information that says that you were informed of your constitutional rights not to have a search made of the premises, right?

"A. Right.

"Q. You read that, right?

"A. Right.

"Q. And you know what those words mean, right?

"A. At that time I was nervous and upset.

"Q. But you know what those words mean, don't you?

"A.   Hmm-hmm.

"Q.   And it goes on to say, hereinafter mentioned without a search warrant and of my right to refuse to consent to a search.   You read those words that night, too, right?

"A.   Yes.

"Q.   And you know what those words mean, right?

"A.   Right.

"Q.   And you know what refuse means, right?

"A.   Right.

"Q.   You did not refuse, right?

"A.   Right.

"Q.   You signed your name to that, right?

"A.   Right.

"Q.   Right here at the bottom line?

"A.   Right.

" * * *

"Q.   And you did have a choice to not sign that consent to search form, right?

"A.   Right.

"Q.   And you signed it anyway, right, knowing that you could refuse, right?

"A.   I signed it because I didn't want to go to jail, and I didn't want my baby to go to Metzenbaum, and I wanted the stuff out of my house.

"Q.   You could have not signed it, right?

"A.   Right.

"Q.   You did sign it, right?

"A.   Right."

Based upon all the facts and circumstances, after weighing all the probabilities in the case, it is thus clear consent to further search the premises was given by Kirkman because she "wanted the stuff out." *State v. Chandler, supra.*  Moreover, the trial court expressly determined the officers' actions were not violative of Kirkman's Fourth Amendment rights.   The trial court stated as follows:

"I'm satisfied, after listening to all of the evidence in this case, that the lessee of the premises was a woman who was frightened, that the police

invaded her premises, that upon the subsequent hindsight justification that there was a consent.  * * * "

Accordingly, the state's third assignment of error is sustained.

Furthermore, since the trial court improperly granted the motion to suppress on the ground defendant's Fourth Amendment rights were violated, the order of the trial court granting defendant's motion to suppress is reversed, and the cause is remanded for further proceedings for Jeffrey D. Davis, defendant herein.

Reversed and remanded for proceedings in accordance with this opinion.

*Judgment reversed*
*and cause remanded.*

NAHRA, P.J., and BLACKMON, J., concur.