[Cite as *State v. Riggins*, 2019-Ohio-3254.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                    :          APPEAL NO.  C-180069
                                             TRIAL NO.  B-1701205(B)
    Plaintiff-Appellee,          :

 vs.                              :          *O P I N I O N.*

DEVARIEH RIGGINS,                 :

    Defendant-Appellant.         :


Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  August 14, 2019


*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *David Hoffman*, Assistant Public Defender, for Defendant-Appellant.

**MOCK, Presiding Judge.**

{¶1}   In six assignments of error, defendant-appellant Devarieh Riggins appeals his convictions and sentences for aggravated murder and aggravated robbery. For the reasons set forth below, we find no merit to the assignments of error and affirm the judgment of the trial court.

### Victim Gunned Down on Way to Work

{¶2}   Defendant-appellant Devarieh Riggins lived with his mother, Jabina Riggins, and several siblings. He met Coron Smith in 2016 after Riggins was released from prison. Riggins and Smith often rode around together in Jabina's silver minivan. On June 28, 2016, Riggins, Smith, Jabina, and Riggins's brother De'oveon decided to drive around the Winton Terrace community in the minivan looking for people to rob.

{¶3}   At approximately 3:30 a.m. on that day, James Tamplin was walking to work in front of the neighborhood recreation center when a silver van approached. Riggins, Smith, and De'oveon got out of the vehicle, and Riggins approached Tamplin. According to Smith's testimony, Riggins ran up to Tamplin and began shooting. Smith, hearing the gunshots, began firing as well. After the victim collapsed, Riggins stood over him and continued to fire until the weapon was empty. Smith later told investigators that Riggins had continued to pull the trigger even after the gun was empty. The group then ran back to the van and fled. Smith asked Riggins what had happened, and Riggins told Smith that it looked like Tamplin was reaching for a weapon. But Smith testified that he had never seen Tamplin with a weapon, and no weapon was later found attributable to Tamplin.

{¶4}   Tamplin attempted to walk home as he began to lose blood. He was eventually picked up by a passing motorist, who drove him home.

{¶5} Tamplin's brother Kevin Lackey, came to the door in response to pounding and screaming. Lackey testified that when the door opened, Tamplin yelled his name and collapsed. Tamplin told him that he had been robbed and shot. Lackey asked Tamplin who shot him, and Tamplin responded that it was a "silver van." While this conversation was going on, Tamplin's mother frantically called 911. After speaking to the man who drove Tamplin home, Lackey left the home to go to the area where Tamplin had been shot, leaving Tamplin with other family members. Lackey found the spot in front of the recreation center where the shooting had occurred and followed the trail of blood several blocks to the point where Tamplin had been picked up by the passerby.

{¶6} Cincinnati Police Officer Christopher Loreaux responded to the 911 call. By the time that he arrived, Tamplin was unable to speak and the other members of the family were "pretty frantic." Tamplin was taken to the hospital, where he underwent surgery for several hours. Doctors were unable to repair the damage, and Tamplin died from his injures later that day.

{¶7} Detective Tracy Jones from the Cincinnati Police Department led the investigation at the scene. He photographed the blood trail from the recreation center to where Tamplin was picked up. At the scene of the shooting, he found three .22-caliber cartridge casings and three 9 mm casings in the area. Information was also retrieved from a nearby stationary license plate reader. Police retrieved photographs of a silver van and its license plate that passed the area at the time of the shooting. The license plate was traced back to Jabina Riggins. Other cameras in the area recorded images of a silver van coming into and leaving the area at the time of the shooting. Detective Jones also recognized that the van matched the description of a vehicle that had been involved in a different shooting three weeks

3

earlier. Using this information, investigators tied the van to Jabina, and Jabina to Riggins and Smith.

{¶8} Over a week later, police officers stopped a white Pontiac that had been reported stolen. Smith was the driver of the vehicle and Riggins was in the front passenger seat. Police found a .22-caliber handgun on the passenger seat, a second .22-caliber pistol next to the passenger seat, and a .38-caliber handgun on the floor in front of the driver's seat. Police also found a bag of white powder on the floor in front of Riggins's seat. Ammunition for a .22-caliber handgun was found in Riggins's pocket. Both men were arrested and charged with having a weapon while under a disability, improper handling of a firearm, carrying a concealed weapon, and trafficking in and possession of drugs.

{¶9} Detective Jones subsequently learned of the arrests of Smith and Riggins and arranged for the weapons that were seized to be tested by the crime lab. The guns were tested against the casings found at the scene of the homicide. Detective Kurt Ballman, who had also been assigned to the case, testified that one of the handguns found by Riggins's seat was the same weapon that had fired the .22-caliber rounds that killed Tamplin.

{¶10} While Riggins was being held on the weapon and drug charges that arose from the traffic stop, Ballman met with him at the Hamilton County Justice Center. Ballman told Riggins that he was only there to take a DNA sample for the weapons charges related to the traffic stop.

{¶11} After his visit, Ballman began to listen to calls made by Riggins from the Hamilton County Justice Center, hoping it would spur him to talk about the homicide. Ballman testified that Riggins called his mother after his arrest and that Riggins was "in what I would call a full-blown panic." The first thing that Riggins told her was that "it's over." Riggins told his mother that a holder was going to be

put on him in the next couple days and that he needed to get out of jail before that happened. He told his mother that he was "about to do 25" and that "[they] about to put a charge on me." Ballman testified to a series of conversations that Riggins had with others in which he was trying to raise money to make his bail before he was charged with more serious offenses. He wanted to make bail so he could flee the jurisdiction and stay with an aunt in Louisville, Kentucky.

{¶12} Riggins pled guilty to having a weapon while under disability and was sent to prison. Detective Ballman tried to interview him there, but Riggins refused to cooperate. He called his mother, who told him that another "dude" had court that day. From the context of the conversation, it appeared that Jabina was referring to Smith. Riggins said that "dude better shut up, though. Better not tell on himself. You feel me? I know they are fishing."

{¶13} After a jury trial, Riggins was found guilty of aggravated murder in violation of R.C. 2903.01(B), murder in violation of R.C. 2903.02(A), murder in violation of R.C. 2903.02(B), felonious assault in violation of R.C. 2903.11(A)(1), felonious assault in violation of R.C. 2903.11(A)(2), aggravated robbery in violation of R.C. 2911.01(A)(1), aggravated robbery in violation of R.C. 2911.01(A)(3)—all with one- and three-year gun specifications—and having a weapon while under a disability. He was sentenced to life in prison for the aggravated-murder charge, plus three years for the related gun specification. He further was sentenced to 11 years in prison for the aggravated robbery in violation of R.C. 2911.01(A)(1), plus three years for the related gun specification. He was also sentenced to three years in prison for having a weapon while under a disability. Riggins was ordered to serve all prison terms consecutively to each other, and was told he would be eligible for parole after 30 years. All of the remaining charges and specifications were merged as allied

offenses of similar import with those charges and specifications for which he was sentenced. His total sentence was 50 years to life.

{¶14} In six assignments of error, Riggins now appeals. For ease of discussion, we will discuss them out of order.

### Destruction of Jail-Call Recordings

{¶15} In his first assignment of error, Riggins claims that the trial court abused its discretion when it allowed Detective Ballman to testify to notes he made of calls Riggins made from the Justice Center when the state had failed to preserve the actual jail recordings.

{¶16} Prior to trial, Riggins filed a motion to prohibit Ballman from testifying from his notes as to the contents of the destroyed recordings. During the hearing, Ballman testified that he had listened to several recordings involving calls between Riggins and others. He said that he took notes on all the calls that were relevant to the investigation. He was able to listen to the recordings through an on-line system at his office, but the system did not allow him to record those calls. In order to obtain recordings for trial, the policy was to email the person at the Justice Center in charge of making the recordings. He testified that he contacted Heather Dobbins by email on October 3, 2016, to begin the process of recording the calls. Ballman testified that he went to the Justice Center several times to pick up the recordings, but each time he was told they were not available. He eventually spoke to a supervisor who told him that Dobbins no longer worked for the Hamilton County Sheriff's Department.

{¶17} Ballman then spoke to a sergeant there and sent a follow-up email relating to his request for recordings. He received an email back indicating that there were 194 calls from Riggins and 1,900 calls from Coron Smith. He responded to the email with information to allow the department to limit the number of calls

6

that he needed. Ballman again went to the Justice Center on "two or three separate occasions" and was told the discs were not there. As the court date approached, Ballman spoke to someone who told him that the recordings were no longer available. Ballman returned to the Justice Center to see if the recordings had been saved, and he was told they had not been.

{¶18} At the conclusion of the hearing, counsel for Riggins argued that, under the rule of completeness, it was unfair to allow Ballman to testify from his notes to those portions of the conversations Ballman felt were relevant when the defense did not have access to the calls themselves to place the notes in context. In essence, it would have been "unfair to the defense for Detective Ballman to testify to parts of these conversations without testifying to the entirety of the conversations."

{¶19} The state responded by noting that, in his motion, Riggins had claimed that the recordings had been destroyed in bad faith, and that Riggins had not made that showing. The state also noted that there was no evidence that anything in the recordings was exculpatory, and that Riggins had not filed a motion to preserve the recordings. The trial court agreed with the state, and it found that there had been no bad faith on behalf of Ballman or the sheriff's department.

{¶20} A decision by a trial court to admit or exclude evidence rests within its sound discretion and will not be reversed absent an abuse of discretion. *State v. Salaam*, 2005-Ohio-4552, 47 N.E.2d 495 (1st Dist.). The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Body Power, Inc. v. Mansour*, 1st Dist. Hamilton No. C-130479, 2014-Ohio-1264, ¶ 28, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 291, 450 N.E.2d 1140 (1983). Most cases will fall within the "unreasonable" prong of discretionary decisions, as few judges issue decisions that are unconscionable or arbitrary. *AAAA Ent., Inc. v. River Place Community Urban*

*Redev. Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). A decision is unreasonable if

> there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result.

*Id.* "An abuse of discretion implies that a decision is both without a reasonable basis and is clearly wrong." *Aetna Better Health, Inc. v. Colbert*, 10th Dist. Franklin No. 12AP-720, 2012-Ohio-6206, ¶ 21, citing *Hartzog v. Ohio State Univ.*, 27 Ohio App.3d 214, 500 N.E.2d 362 (10th Dist.1985).

{¶21} When a defendant claims that his due-process rights have been violated by the destruction of evidence, the first determination is whether the evidence that was destroyed was materially exculpatory or merely potentially useful. When the evidence is materially exculpatory, a defendant need not show that it was destroyed in bad faith in order to show a due-process violation. *Brady v. Maryland*, 373 U.S. 83, 87, 93 S.Ct. 1194, 10 L.Ed.2d 281 (1963). Evidence is materially exculpatory " 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " *State v. Johnston*, 39 Ohio St.3d 48, 61, 529 N.E.2d 898 (1988), quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "The *Brady* test is stringent" and thus, " '[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.' " *State v. Jackson*, 57 Ohio St.3d 29, 33, 565 N.E.2d 549 (1991), quoting *United States*

*v. Agurs*, 427 U.S. 97, 109-110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). A defendant bears the burden to prove that withheld evidence is materially exculpatory. *State v. Benson*, 152 Ohio App.3d 495, 2003-Ohio-1944, 788 N.E.2d 693, ¶ 11 (1st Dist.), citing *State v. Benton*, 136 Ohio St.3d 801, 805, 737 N.E.2d 1046 (2000).

{¶22} In this case, Riggins notes that "the state cannot show that Justice Center call records lacked any exculpatory value." But the state did not have that burden. Riggins also speculates that the calls might have contained conversations in which he said that he was being set up as a "scapegoat." But there is nothing in the record to support that claim, and Riggins has made no showing that the recorded calls contained exculpatory information.

{¶23} Riggins alternately argues that Detective Ballman acted in bad faith and that the recordings of the phone calls between Riggins and third parties were potentially useful. As a result, he claims that the trial court should have prevented Ballman from testifying. If the evidence is merely potentially useful, a showing of bad faith is necessary to demonstrate that the destruction of the evidence violated due process. *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). The term bad faith "generally implies something more than bad judgment or negligence. 'It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud.' " *State v. Wolf*, 154 Ohio App.3d 293, 2003-Ohio-4885, 797 N.E.2d 109, ¶ 14 (7th Dist.), quoting *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 276, 452 N.E.2d 1315 (1983). At its core, it "embraces actual intent to mislead or deceive another." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 81. The negligent destruction of evidence is insufficient to support a claim of bad faith. *United States v. Houston*, 584 F.3d 1151, 1155 (8th Cir.2008).

{¶24}   Riggins outlines some of the history of Ballman's involvement in trying to secure the recordings, and concludes by saying "[Ballman's] failure to order a copy of [Riggins's] calls without an explanation requires a finding of bad faith, because there is no plausible explanation for the delay, or even an acknowledgement that the conduct needed explaining." Riggins first argues that Ballman testified that he went to the Justice Center rather than emailing and, as a result, "the person whose job it was to copy the recording would not have a written request to follow up on." But the record is clear that Riggins had sent several emails to the Justice Center to request the recordings. Additionally, Riggins tries to imply that the record shows that Ballman knew that the sheriff's office had a one-year retention policy for calls made in the Justice Center by arguing that "[h]e never explicitly testified that he had been unaware of the one-year retention period." The fact that Ballman did not testify to being unaware of the retention period does not allow for the inference that he knew about it. It only shows that he was not asked about it during the hearing, which he was not.

{¶25}   To determine whether this record establishes bad faith, it is helpful to compare the case to one in which this court has found bad faith to exist. In *State v. Benson*, a defendant filed a motion to suppress in an OVI case when the video recording of his stop was not preserved. *State v. Benson*, 152 Ohio App.3d 495, 2003-Ohio-1944, 788 N.E.2d 693, ¶ 6. Benson had originally been told that no videotape existed. But during a hearing on a subsequently-filed motion to suppress, "it became evident that a tape had existed." *Id.* at ¶ 5. The police officer first testified that there was no videotape. *Id.* Then he testified that there was a videotape, but he was not sure if the camera was recording at the time of the stop. *Id.* After additional questioning, the officer testified that the camera was on, but that he did not think that the field-sobriety tests would be on the recording. *Id.* He also testified that he

10

was aware that a subpoena had been issued for the videotape and that he did not look for it when asked to do so by the prosecutor. *Id.*

{¶26} This court concluded that Benson had demonstrated bad faith. In so finding, this court reasoned:

It is clear that the officer was dishonest with the prosecution about whether a tape actually existed, and even at the suppression hearing, it was difficult to pin down his answer about whether a tape actually existed. In the end, the officer surmised that, even if the tape had existed, it probably did not contain evidence of the field sobriety testing. In our view, the officer acted in bad faith by not turning over the tape to the prosecution and by subsequently destroying it.

*Id.* at ¶ 14.

{¶27} The facts in this case are distinguishable from those in *Benson*. Detective Ballman testified to the lengths he went to in order to secure the recordings. No evidence was presented about why the emails went unanswered or the procedures followed by the Hamilton County Sheriff's Department. Ballman testified that he followed the same procedures he had followed in the past, but that somehow the request had fallen through the cracks. The accidental or negligent loss of evidence does not constitute bad faith. *State v. Geeslin*, 116 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1, ¶ 14. There is no evidence that Ballman's conduct rose to the level of "a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *See Wolf*, 154 Ohio App.3d 293, 2003-Ohio-4885, 797 N.E.2d 109, at ¶ 14. "What we have here is, at most, bad judgment or negligence. Bad judgment and negligence are not enough to violate a defendant's due process rights." *State v. Acosta*, 1st Dist. Hamilton No. C-020767, 2003-Ohio-6503, ¶ 11. The trial court did not abuse its

discretion when it determined that Ballman did not act in bad faith and allowed him to testify about the calls. We overrule Riggins's first assignment of error.

### Dying Declaration

{¶28} In his fourth assignment of error, Riggins claims that the trial court erred when it admitted the testimony of Kevin Lackey that Tamplin told him that he had been robbed and shot. The trial court allowed the testimony as a dying declaration.

{¶29} The statement that he had been robbed and shot was being admitted for its truth, so it constituted hearsay. *See* Evid.R. 801(C). Therefore, it would not be admissible pursuant to Evid.R. 802 unless an exception listed in either Evid.R. 803 or 804 applied. The state argued below, and the trial court found, that the statement fell within the exception for dying declarations. Evid.R. 804(B)(2) allows for the admission of "a statement made by a declarant, while believing that his or her death was imminent, concerning the cause or circumstances of what the declarant believed to be his or her impending death."

{¶30} To fall under this exception, the record must show that the deceased's statements were made under a sense of impending death and that the deceased did not believe that he or she would recover. *State v. Kennedy*, 2013-Ohio-4221, 998 N.E.2d 1189, ¶ 41 (1st Dist.), citing *State v. Washington*, 1st Dist. Hamilton No. C-090561, 2010-Ohio-3175, ¶ 21. The declarant is not required to state that he believes that he will not survive; rather, the necessary state of mind can be inferred from circumstances at the time of the declaration. *Kennedy*, citing *State v. Ross*, 7th Dist. Mahoning Nos. 96-CA-247 and 96-CA-251, 1999 WL 826223 (Oct. 12, 1999). The decision of whether a statement can be properly admitted as a dying declaration is reviewed under an abuse-of-discretion standard. *See State v. Morales*, 1st Dist.

Hamilton No. C-070776, 2009-Ohio-1800, ¶ 16, citing *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus.

{¶31} The problem with this case is that there is little evidence in the record of the victim's state of mind other than the circumstances of his shooting and injury. The only evidence the state presented about what had occurred immediately after the shooting was from the testimony of Lackey, who provided no testimony from which Tamplin's state of mind could be assessed. The state presented evidence that Tamplin had been shot, had lost a significant amount of blood, and had eventually died from his wounds. A number of cases have held that, with a similar lack of evidence, the admission of statements as dying declarations was erroneous. *See*, *e.g.*, *State v. Tesfagiorgis*, 10th Dist. Franklin No. 98AP-1215, 1999 WL 604118 (Aug. 12, 1999); *State v. Matthews*, 189 Ohio App.3d 446, 2010-Ohio-4153, 938 N.E.2d 1099 (2d Dist.); *State v. Woods*, 47 Ohio App.2d 144, 147, 352 N.E.2d 598 (9th Dist.1972); *State v. Everson*, 2016-Ohio-87, 57 N.E.3d 289 (7th Dist.).

{¶32} On this record, we cannot say that there was sufficient evidence of Tamplin's state of mind to demonstrate that he believed that his injuries were fatal and that he had no hope of recovery. Therefore, the trial court erred when it found that the statement was admissible as a dying declaration.

{¶33} But even if Tamplin's statement did not constitute a dying declaration, we will not sustain this assignment of error if the admission of the testimony constituted harmless error. As the Seventh Appellate District noted:

> Hearsay errors, like all other evidentiary errors, are subject to harmless error review. Evid.R. 103(A); Crim.R. 52(A). Unless an error regarding an evidentiary ruling affects a substantial right, it will be deemed harmless and does not require a reversal of the judgment. *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153,

13

¶ 23. This includes evidentiary errors involving constitutional rights, such as the right to confront witnesses. *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 177; *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 78. The test for harmless error involving constitutional questions is whether the error was harmless beyond a reasonable doubt, meaning that there is no reasonable possibility that the unlawful testimony contributed to the conviction. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *see also State v. Lytle*, 48 Ohio St.2d 391, 358 N.E.2d 623 (1976), paragraph three of the syllabus, vacated on other grounds in 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154 (1978).

*Everson* at ¶ 23. The *Everson* court, while it found that the statement was not admissible as a dying declaration, went on to conclude the admission was harmless because the statement could have been admitted as an excited utterance.

It is apparent from the cases reviewed under this assignment of error that these declarations may often be admitted under the hearsay exception for excited utterances, Evid.R. 803(2): "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." In order to qualify as an excited utterance, the following factors must be established: (1) there was an event startling enough to produce a nervous excitement in the declaran[t], (2) the statement must have been made while under the stress of excitement caused by the event, (3) the statement must relate to the startling event, and (4) the declarant must have had an opportunity to personally observe the startling event. *State v. Boles*, 190 Ohio App.3d 431, 2010-Ohio-5503,

942 N.E.2d 417, ¶ 34 (6th Dist.), citing *State v. Duncan*, 53 Ohio St.2d 215, 373 N.E.2d 1234 (1978).

> There is no question that the shooting was an event startling enough to produce nervous excitement in the victim. His statement was given shortly after he was shot, while under the stress of the shooting. As evidence of his stress, he instructed his mother to call 911. The statement identifying the shooter relates to the startling event. Finally, the victim personally experienced the startling event. The elements of the excited utterance exception have been met and this statement could have been admitted at trial as an excited utterance. Therefore, any error in admitting the statement as a dying declaration was harmless.

*Id.* at ¶ 24-25. This court has outlined a similar analysis. *See State v. Morales*, 1st Dist. Hamilton No. C-070776, 2009-Ohio-1800. In that case, this court found that the statement at issue constituted a dying declaration. But, in addressing the dissent which would have not reached that conclusion, the majority wrote:

> The dissent makes the point that the requirement that a declarant sensed that his or her death was "imminent" is a stringent one. We believe that this requirement was met here but, even if it was not, the statement could have been properly admitted as an "excited utterance." Any error in the admission of the statement as a dying declaration, therefore, was harmless.

*Id.* at ¶ 17.

{¶34} It is worth noting that several minutes passed from the time of the shooting and when Tamplin told Lackey he had been shot and robbed by people in a silver van. While the passage of time between the event and the declaration is

15

relevant, it is not dispositive of the issue. *State v. Taylor*, 66 Ohio St.3d 295, 303, 612 N.E.2d 316 (1993). The statement need not be strictly contemporaneous with the startling event in order for it to constitute an excited utterance. *State v. Duncan*, 53 Ohio St.2d 215, 373 N.E.2d 1234 (1978). " '[E]ach case must be decided on its own circumstances, since it is patently futile to attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous exclamation.' " *Taylor* at 303, quoting *Duncan* at 219-220. The key determining factor is whether the declarant is still under the stress of the event or whether the statement was the result of reflective thought. *Id.*

{¶35} In this case, Tamplin was clearly still under the stress of having been shot. His condition had not improved, and he was on the verge of becoming non-communicative and then unconscious when he made the statement. Therefore, while the trial court improperly determined that Tamplin's statement was admissible as a dying declaration, that error was harmless because the statement could have been admitted as an excited utterance. We overrule Riggins's fourth assignment of error.

**Sufficiency of Evidence**

{¶36} In his third assignment of error, Riggins claims that his convictions were based upon insufficient evidence. In a challenge to the sufficiency of the evidence, the question is whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *State v. Robinson*, 1st Dist. Hamilton No. C-180153, 2018-Ohio-4433, ¶ 3, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶37} Riggins argues that he could not be convicted of aggravated robbery because there was no evidence of a theft or an attempted theft. He argues that there

16

was no theft offense involved in the group's journey in the van looking for a victim, or even the brandishing of the weapons, in the absence of a demand for money. We disagree.

{¶38} The four were prowling Cincinnati neighborhoods in a van for the purpose of finding people to rob. When Riggins saw the Tamplin, he told Smith that that was the target he wanted to rob. Riggins took his weapon and approached the victim ahead of Smith. After the shooting, Tamplin told his brother not just that he had been shot by someone in a silver van, but that he had been robbed and shot. So, while we do not know the specific act that Riggins performed, it was such a substantial step toward the commission of a robbery that Tamplin believed that he was being robbed.

{¶39} The facts of this case are similar to the facts in *State v. Williams*, 8th Dist. Cuyahoga No. 95796, 2011-Ohio-5483. In that case, someone overheard Williams's plan to rob an individual. The witness saw Williams near the victim and heard gunshots shortly thereafter. The court held that, under these facts, the theft had been attempted but had gone awry. *Id.* at ¶ 18. Similarly, in this case, a theft had been attempted but had gone awry. Riggins began firing when he thought Tamplin was reaching for a weapon. Since Tamplin had no weapon, it is possible that he was instead reaching for valuables to produce for Riggins—an action Riggins misread. Be that as it may, the state presented sufficient evidence that Riggins had attempted to rob Tamplin prior to shooting him. We overrule Riggins's third assignment of error.

**Weight of the Evidence**

{¶40} In his second assignment of error, Riggins claims that his convictions were contrary to the manifest weight of the evidence. In reviewing a challenge to the weight of the evidence, we must review the entire record, weigh the evidence,

consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *Robinson*, 1st Dist. Hamilton No. C-180153, 2018-Ohio-4433, at ¶ 3, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶41} Riggins makes a number of arguments relating to the value of the evidence in the case. First, he argues that Smith's testimony was not credible and that it was inconsistent with his previous statement. He also argues that the statements he made during his phone calls while in the Justice Center were "not necessarily incriminating." He further claims that he did not commit the murder, but instead was "taking one for the team" to protect his mother and brother. He also argues that, if he had been the shooter, he would not have been dumb enough to have the murder weapon near him when the car he was in was stopped by the police.

{¶42} The evidence presented supported both the convictions for aggravated robbery and aggravated murder. For the conviction of aggravated robbery pursuant to R.C. 2911.01(A)(1), the state had to show that Riggins, while attempting or committing a theft offense, had a deadly weapon on or about his person or under his control, and either displayed the weapon, brandished it, indicated that he possessed it, or used it. For the conviction for aggravated murder pursuant to R.C. 2903.02(B), the state had to show that Riggins purposely caused the death of the victim while committing the aggravated robbery. The weight given to the evidence, including witness credibility, is best left to the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), syllabus.

{¶43} Smith testified that he was with Riggins when the shooting occurred. He was in a vehicle with Riggins, and Riggins's brother and mother. The group was driving around "to come up with some money," which Smith explained meant they were looking for people to rob. The group spotted Tamplin, and Smith said that

18

Riggins said that he wanted to get him. Riggins exited from the vehicle, and Smith followed behind. Riggins "ran up on" the victim and started shooting him. After the victim fell, Riggins stood over him, firing his weapon until his gun was empty, and continued to pull the trigger even after that. The four left in the vehicle and the victim attempted to walk back home. When the victim got home, he told his brother that he had been robbed and shot, and that the shooters were in a silver van. Police were able to get a license plate from nearby surveillance cameras and later stopped a vehicle in which Riggins was a passenger. The gun that was used for the killing, the gun that Smith had said that Riggins had used, was found by Riggins's seat in the vehicle. While in the Justice Center, Riggins made a number of phone calls in which he indicated that he was about to be charged with murder and needed bail money so he could flee the jurisdiction.

{¶44}   While Smith gave a different account to the police about who was in the car, that did not preclude the jury from believing the testimony he presented at trial. Further, the fact that Riggins presented alternate explanations for the meaning of what he said during the phone calls and proposed that he was being set up by other family members does not demonstrate that the jury lost its way and created a manifest miscarriage of justice. Riggins's convictions were not against the weight of the evidence. We overrule his second assignment of error.

**Ineffective Assistance**

{¶45}   In his sixth assignment of error, Riggins argues that trial counsel was ineffective for failing to argue that the state had not proven that there was no evidence of theft or attempted theft and failing to make subsequent objections after the initial testimony that Tamplin had reported being robbed and shot by someone in a silver van.

{¶46}   A court will presume that a properly licensed attorney is competent, and the defendant bears the burden to show ineffective assistance of counsel. *State v. Hamblin*, 37 Ohio St.3d 153, 155-156, 524 N.E.2d 476 (1988); *State v. Hackney*, 1st Dist. Hamilton No. C-150375, 2016-Ohio-4609, ¶ 36. To sustain a claim of ineffective assistance of counsel, the defendant must show that counsel's performance was deficient, and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Hackney* at ¶ 36.

{¶47}   On the issue of failing to argue that there was no evidence of an attempt to rob Tamplin, the state had demonstrated, through the testimony of Smith, that the plan had been to rob the victim. The fact that Riggins perceived a threat before he had completed the robbery does not negate the fact that he was approaching the victim for the purpose of robbing him. He clearly demonstrated that robbery was his plan, because Tamplin later reported that he had been robbed and shot. At no point during the course of the trial did anyone believe otherwise. Counsel could easily have decided that there was enough circumstantial evidence of a robbery attempt to choose not to argue that point in order to avoid seeming like he was trying to get his client out on a hyper-technical basis. Counsel's strategy was to focus instead on claiming that Riggins was being set-up by his family to take the fall, an idea the jury could embrace and, if believed, would have exonerated Riggins. The fact that this argument was ultimately unsuccessful does not establish that the strategy constituted ineffective assistance. *See State v. Casey*, 2018-Ohio-2084, 113 N.E.3d 959, ¶ 34 (12th Dist.).

{¶48}   Regarding the failure to object to the subsequent admission of Tamplin's statement that he had been robbed and shot, trial counsel had objected the first time Tamplin's statement was introduced. The decision to forego subsequent objections to

the same evidence is a legitimate strategy. In *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, the Ohio Supreme Court explained that:

> [E]xperienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. * * * In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice.

(Internal quotations and citations omitted.) *Id.* at ¶ 140. Repeated objections to the admission of the same testimony from different sources would not have resulted in a different ruling and would likely have been viewed unfavorably by the jury. Counsel was not ineffective in this regard. We overrule Riggins's sixth assignment of error.

### Allied Offenses

{¶49} In his fifth assignment of error, Riggins argues that the aggravated-murder and aggravated-robbery counts were allied offenses of similar import and should have been merged prior to sentencing. But this court has held that aggravated murder and aggravated robbery are not allied offenses of similar import. This court stated that

> where an offender's conduct demonstrated a purpose, or specific intent, to kill while in the course of committing an aggravated robbery, the two offenses were committed with a separate animus and thus were separately punishable under R.C. 2941.25(B). * * * The jury here returned a guilty verdict for aggravated murder in violation of R.C. 2903.01(B), after being instructed that "[a]person acts purposely when

it is her specific intention to cause a certain result. It must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to cause the death of [Lowe]." *Because the jury determined that [the defendant] had a specific intent to kill [the victim] by finding her guilty of aggravated murder*, and because we ratified that finding by rejecting [the defendant's] weight-and-sufficiency-of-the-evidence assignments of error, *the aggravated-murder offense was committed with a separate animus or motivation from the aggravated-robbery offense*, and thus the two offenses did not merge under R.C. 2941.25(B).

(Emphasis added.) *State v. Flagg*, 1st Dist. Hamilton No. C-170015, 2018-Ohio-1702, ¶ 39, *appeal not allowed*, 153 Ohio St.3d 1454, 2018-Ohio-3026, 103 N.E.3d 832.

{¶50}   In this case, Riggins approached the victim with the intent to rob him. When the victim moved his hand in a way that Riggins perceived as reaching for a weapon, Riggins began to fire at the victim. Riggins continued to fire at the victim even after he was on the ground and past the point when Riggins had no more ammunition in his gun. This evidence demonstrates that Riggins's intent to kill was distinct from his intent to rob the victim. Therefore, the counts were not allied offenses of similar import. *See State v. Sanders*, 1st Dist. Hamilton No. C-140579, 2015-Ohio-5232, ¶ 49 (shooting the victims from behind and at close range demonstrated a specific intent to kill, separate from the immediate motive of committing the robbery). The fifth assignment of error is overruled.

## Conclusion

{¶51}   Having considered and rejected each of Riggins's six assignments of error, we affirm the judgment of the trial court.

Judgment affirmed.

**ZAYAS, J.**, concurs.
**BERGERON, J.**, concurs separately.

**BERGERON, J.,** concurring separately.

{¶52}    I concur in the court's judgment and agree that the evidence in the record supports Mr. Riggins's convictions.   I write separately to highlight an aspect of this case that deserves our attention: the state's destruction of the jailhouse calls. Because the record before us does not adequately develop this assignment of error, however, I am constrained to concur with the majority in affirming the decision of the trial court.

{¶53}    Mr. Riggins asserts that the state violated his due process rights when it destroyed the jailhouse calls about which Detective Ballman testified.  I agree with the majority's description of the standard applicable where destroyed evidence—as conceded here by Mr. Riggins—is potentially usefully and not materially exculpatory: the proponent must show bad faith on the part of the state to establish a due process violation.   With that standard in mind, a summary of the relevant portions of the proceedings, both prior to and during the trial, illuminates the analysis.

{¶54}    Mr. Riggins's trial counsel moved to exclude Detective Ballman's testimony as to the contents of the destroyed recordings.   At the hearing on that motion, he began by noting that, "in order for the Court to determine [whether or not the evidence was destroyed in bad faith], there would be a need for testimony from the custodian of records with the Hamilton County Sheriff's Office. * * * .  We would ask the Court to consider ordering that discovery be provided * * * so that we could determine how or why the recordings were destroyed."   The trial court does not appear to acknowledge this request in the transcript of the proceedings.   But at the close of Detective Ballman's testimony on this motion, the trial court asks Mr.

23

Riggins's counsel: "[A]nything else?" For unknown reasons, counsel does not return to the point made previously and allowed the record to be closed on the matter.

{¶55} This failure constrains our ability to more fully analyze the bad faith allegations, as we are left with little more than the testimony of Detective Ballman. Nevertheless, that testimony paints a remarkable picture.

{¶56} Detective Ballman began listening to Mr. Riggins's jailhouse conversations in July of 2016. He testified that he listened to more phone calls in late fall of 2016, and that it was at that point that he "wanted to have those calls isolated and recorded and given to [him]." Because they can only listen to jailhouse calls at their desks, but not save them on their computers, detectives must mark and request relevant calls by "email[ing] the person in charge to get the disks." In the meantime, Detective Ballman made notes on "what [he believed] would be relevant down the road to what the case would be or turn out to be."

{¶57} Detective Ballman launched his first request for the calls by email to Heather Dobbins with the Hamilton County Justice Center on October 3, 2016. He was "e-mailing her, e-mailing her, e-mailing her, and showing up usually within a week to try to recover the disks." In addition to emailing, he made a series of personal requests for the disks. He starting showing up at the Justice Center every time that he had court. He would also rummage around the desk of the secretary that kept disks to no avail. He "repeatedly [e-mailed] this individual" and, eventually, upon showing up at the Justice Center in person in early 2017, Detective Ballman discovered that Ms. Dobbins was no longer in the position of creating jailhouse-call disks. It is not clear whether she left the Justice Center or switched positions.

{¶58} Regardless, Detective Ballman escalated his request to the sergeant in charge of the unit, who—perhaps in true Kafkaesque fashion—assured him that it

would be handled. His subsequent emails were forwarded to a new person (purportedly now in charge of jailhouse-call disks), but Detective Ballman began to suspect that his requests were doomed to bureaucratic purgatory. Nevertheless, he persisted in making requests (which apparently fell on deaf ears) until early summer of 2017, when he learned that the recordings had been deleted. While Detective Ballman could not recall the specific dates, he agreed that this "fool's errand" persisted anywhere from six to eight months.

{¶59} This testimony is certainly redeeming for Detective Ballman; but in my view, it throws open the door to a more damning claim of bad faith on the part of the state, as the "state" encompasses the employees of the Justice Center for our purposes. Detective Ballman followed procedure, appears to have gone above and beyond in monitoring his requests and escalating it where necessary, but ran into a brick wall. The state offers no justification or excuse for the institutional and systemic blockade of Detective Ballman's requests. But every point that the state makes in propping up Detective Ballman's conduct boomerangs back to undermine the good faith of the Justice Center employees.

{¶60} Nor was the inquiry out of the ordinary—we are dealing with a procedure that is no doubt widely-used and critical to a multitude of serious criminal cases in this jurisdiction. As evidenced here, the stakes could scarcely be higher; and yet the state offers nothing in the way of mitigation or explanation other than the diligence of a particular detective, who is part of a completely separate arm of state law enforcement. And recall that, while the state had no qualms about destroying this evidence, it also affirmatively wielded the notes that Detective Ballman transcribed about the calls to secure a conviction. It would be one thing if Detective Ballman crumpled up his notes and pitched them in a trashcan because they were useless, but much to the contrary, the trial transcript reflects roughly 20 pages of

testimony regarding these calls, which comports with Detective Ballman's acknowledgement that the calls that he personally noted and requested were "important evidence in a murder case."

{¶61} I am deeply troubled by the implications of Detective Ballman's testimony as to conduct by the state—namely, the Justice Center. *See State v. Durnwald*, 163 Ohio App.3d 361, 2005-Ohio-4867, 837 N.E.2d 1234, ¶ 36 (6th Dist.) (finding bad faith where evidence was destroyed, not because of equipment malfunction, but instead due to "complete and utter failure to safeguard evidence relevant to a crime and arrest"). The "state" (here, encompassing Detective Ballman and the Justice Center) knew the following: (1) the tapes constituted important evidence in a murder investigation; (2) the state viewed some of the calls as sufficiently helpful to its case that it would use the substance of them at trial; (3) records were requested in October 2016 at the latest; and (4) under the normal document retention policy, the tapes would be destroyed by summer of 2017. And recall, Detective Ballman did not make a solitary request that could have been lost in a bureaucratic haze. Rather, he persistently emailed and made personal entreaties at every turn, only to be greeted by a pattern of stonewalling.

{¶62} Nevertheless, the record was not developed in such a way as to provide this court with specific evidence of Justice Center employee action or office practices to substantiate a due process violation claim. Detective Ballman refered to the jailhouse call monitoring system as "a dumb way to do business" and "[not] very effective," and that is probably a charitable assessment. It is wholly unacceptable to leave a defendant in this position—his liberty at stake—without a remedy. Had the proceedings below established evidence of the Justice Center's indifference in the face of important evidence in a murder case, not merely strong suggestion by inference, it might have entitled Mr. Riggins to a new trial.

{¶63} For similar reasons, I concur—given the constraints of the record before us—in the denial of Mr. Riggins's ineffective assistance claim. But further record development may well show that Mr. Riggins had a winning hand on that point. As noted above, Mr. Riggins's counsel certainly appreciated the need to explore discovery of the Justice Center but then apparently dropped the ball. Perhaps further digging would reveal good reasons for this, but perhaps not. I leave that question for another day.

Please note:

The court has recorded its own entry on the date of the release of this opinion.