[Cite as *State v. Rosemond*, 2019-Ohio-5356.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-180221 |
| | | TRIAL NO. B-1507143 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| ANTHONY ROSEMOND, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Vacated in Part, and Cause Remanded

Date of Judgment Entry on Appeal: December 27, 2019

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, *Joshua A. Thompson* and *Krista M. Gieske*, Assistant Public Defenders, for Defendant-Appellant.

**MOCK, Presiding Judge.**

{¶1}    In eight assignments of error, defendant-appellant Anthony Rosemond claims that he was improperly convicted of murder with specifications, a special felony, three counts of felonious assault with specifications, felonies of the second degree, three counts of having a weapon while under a disability, felonies of the third degree, trafficking in heroin with a specification, a felony of the second degree, and trafficking in cocaine with a specification, a felony of the fourth degree. We affirm the decision of the trial court.

{¶2}    The counts in the indictment issued against Rosemond arise from two separate core incidents. The first nine counts relate to an event that occurred on December 8, 2015. On that date, gunmen attacked four individuals who were sitting inside of a car near the Schwarz Market in Cincinnati. The shooting resulted in the death of one individual and the injury of the other three. As a result of those events, Rosemond was indicted for murder, felony murder, three counts of felonious assault causing serious bodily harm, three counts of felonious assault with a deadly weapon, and one count of having a weapon while under a disability.

{¶3}    The second event occurred five days prior. On that date, police officers initiated a traffic stop of a vehicle at the nearby Fay Apartments in which they later came to believe Rosemond had been a passenger. After finding cocaine in the car, officers then searched a unit in the Fay Apartments to which they believed Rosemond had access. After police found additional drugs and two handguns, Rosemond was indicted for trafficking in and possession of heroin, trafficking in and possession of cocaine, and two counts of having a weapon while under a disability.

{¶4}    Following several pretrial motions, the cause was tried before a jury for six days. Rosemond was found guilty on all counts and related specifications. At

sentencing, the trial court merged a number of counts as allied offenses of similar import. Rosemond was then sentenced to an aggregate total of 57 years to life in prison.

### The Traffic Stop and Fay
### Apartment Search

{¶5} Early in the morning of December 3, 2015, Cincinnati police officers Robert Wilson and Danny Brockmann were patrolling the Fay Apartments—a large apartment complex on the west side of the city. As they were driving down one of the streets within the complex, they were passed by a vehicle traveling at a high rate of speed. The officers testified that they believed they saw two adults in the front seats of the car as it drove past. The officers turned their cruiser around and attempted to follow the vehicle, but soon lost sight of it.

{¶6} A few minutes later, the officers came upon the vehicle in a parking lot behind one of the buildings in the complex. By the time officers approached the vehicle, there was one adult in the driver's seat and no front passenger. The driver was a woman named Jourdan Bailey. Officers described her as rude and curt in her interactions with them. Bailey's five-year-old son was in the back seat of the car. Bailey denied living in the complex, but the computer records the officers checked demonstrated otherwise. Bailey told the officers that she was visiting a cousin who lived in the complex, and that she had driven behind the apartment building to let her son urinate there.

{¶7} The officers searched the vehicle and found a bag of cocaine lodged between the passenger seat and the door. They also found a large, distinctive Pelle Pelle leather jacket with a state-issued identification card belonging to Rosemond in the pocket. The officers retained the identification and returned the jacket to the

back seat. Bailey was arrested for cocaine possession. When Bailey was arrested, her son began to cry and told officers that his dad had just jumped out of the car.

{¶8} The officers noticed that Bailey had a key on her key chain that they recognized as a key for an apartment in the Fay Apartments. The officers went to the apartment in which records indicated Bailey resided. When they determined that the key opened the door, they conducted a protective sweep of the apartment to ensure that Rosemond was not inside. Their intent was to secure the apartment while they obtained a search warrant. After obtaining the search warrant, officers found a digital scale, heroin, cocaine, marijuana, and two pistols.

### The Death of Jonathan Austin

{¶9} Five days later, Jonathan Austin and three friends arrived at the Schwarz Market, located near the Fay Apartments. Austin had been trying to keep a low profile because he had testified in the trial of a man who had killed Austin's cousin. The four men were at the market to purchase marijuana. Ariontez Nared went into the store to purchase marijuana, while Austin, Deion Willingham, and Dante Williams waited in the car. When Nared returned to the vehicle, two to three gunmen approached the vehicle and began firing. Austin died at the scene from his injuries, and Nared, Willingham, and Williams were all injured.

{¶10} The shooting was captured by various security cameras in the area. One of the officers who had arrested Bailey viewed the video recordings and recognized the Pelle Pelle jacket from the Fay Apartment stop. At trial, Nared testified and identified Rosemond as the shooter. The jacket, when retrieved by law enforcement, had gunshot residue on the sleeve.

**Severance**

{¶11}   In his first assignment of error, Rosemond claims that the trial court erred when it allowed the counts related to the December 3 traffic stop to be tried along with those related to the December 8 shootings.  Before trial, counsel had filed a motion to sever the December 3 counts from the December 8 counts.  Citing only Crim.R. 14, he argued that the two sets of counts "occurred separate and apart" from one another, they were different kinds of offenses, and the admission of the evidence concerning one set of offenses would not have been proper in a trial of the second set pursuant to Evid.R. 404(B).  Rosemond filed a supplemental motion for severance, again citing only Crim.R. 14, arguing that the two of the weapons-under-disability counts should be tried separately.  He later filed a second supplemental motion, again citing only Crim.R.14, asking the trial court to sever a third weapons-under-disability charge.  Trial counsel renewed the motion, as supplemented, at the beginning of the case; but he failed to renew it at the close of the state's case or at the close of the evidence.  While the dissent indicates that we have confused Crim.R. 14 with Crim.R. 8, Rosemond never made his argument pursuant to Crim.R. 8.  This includes the fact that Rosemond's argument on appeal was limited to arguing the failure of the trial court to grant his "motion to sever" filed pursuant to Cri.R. 14.  Rosemond has not argued—below or to this court—that the joinder of offenses violated Crim.R. 8.  We therefore restrict our analysis to the arguments presented below.

{¶12}   Rosemond recognizes that he failed to properly renew his motion below, but argues that the trial court committed plain error when it failed to order severance.  While counsel for Rosemond did renew the motion, he renewed it at the beginning of trial.  This was insufficient.  As this court recently noted, the failure to renew a motion to sever at the close of the state's case and the close of the evidence

constitutes a waiver of that argument on appeal. *State v. Savage*, 1st Dist. Hamilton No. C-180413, 2019-Ohio-4859, ¶ 17, citing *State v. Bennie*, 1st Dist. Hamilton No. C-020497, 2004-Ohio-1264, ¶ 20.

{¶13} But a mere forfeiture by failure to preserve an issue does not extinguish a claim of plain error under Crim.R. 52(B). *See State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 23. To prevail on a claim of plain error, an accused must show that an error occurred, that the error was plain, and that the error affected the outcome of the trial. *See* Crim.R. 52(B); *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). An appellant must demonstrate a reasonable probability that the error resulted in prejudice. *See State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. In this case, we conclude that Rosemond cannot demonstrate plain error because the trial court did not abuse its discretion when it denied the motion to sever.

{¶14} Generally, the law favors joinder because a single trial will conserve time and expense and may minimize the potentially disparate outcomes that can result from successive trials before different juries. *State v. Schiebel*, 55 Ohio St.3d 71, 86-87, 564 N.E.2d 54 (1990). Where a defendant claims that joinder was improper, he must affirmatively show that his rights were prejudiced. *See State v. Roberts*, 62 Ohio St.2d 170, 175, 405 N.E.2d 247 (1980); *see also* Crim.R. 14.

{¶15} A reviewing court will conclude that joinder was not prejudicial if it makes one of two determinations. *State v. Wiles*, 59 Ohio St.3d 71, 77, 571 N.E.2d 97 (1991). The first determination, known as the "other acts test," may negate prejudice from joinder if the state could have introduced evidence of one offense in a separate trial of another offense under the other-acts provision of Evid.R. 404(B). *State v. Franklin*, 62 Ohio St.3d 118, 122, 580 N.E.2d 1 (1991). The second determination,

known as the "joinder test," requires only a showing that the evidence of each of the joined offenses is "simple and distinct." *Id.* As this court described it,

> [t]he object of the "simple and distinct" test is to prevent the jury from improperly considering evidence of various crimes as corroborative of each other. "[T]he very essence of this rule is that the evidence be such that the jury is unlikely to be confused by it or misuse it." Generally, under the simple-and-distinct test, if the evidence of each offense is direct and uncomplicated, it is presumed that the trier of fact is capable of segregating the proof and not cumulating evidence of the various offenses being tried.

(Citations omitted.) *State v. Echols*, 128 Ohio App.3d 677, 694, 716 N.E.2d 728 (1st Dist.1998).

{¶16} In this case, the evidence related to the counts arising from the December 3 traffic stop was distinct from the evidence related to the December 8 shooting. The jury in this case was unlikely to have confused which evidence related to which incident. *See State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 37 (the jury would not have been confused about what evidence proved the murder and what evidence proved an unrelated aggravated robbery).

{¶17} In order to analyze the question of whether misjoinder resulted in prejudice, the dissent cites *United States v. Lane,* 474 U.S. 438, 450, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). In that case, the United States Supreme Court said that a court should consider (1) whether the evidence of guilt was overwhelming and the effect of any improperly admitted evidence on the verdict; (2) the steps taken to mitigate the effects of the error; and (3) the extent to which the improperly admitted evidence as to the misjoined counts would have been admissible at trial on the other counts. *Id.* But that

case, and the other cases referenced in that section of the dissent's analysis, are all applying the Federal Rules of Criminal Procedure.

{¶18} In Ohio, the Ohio Supreme Court has established the two-prong test set forth above for considering prejudicial misjoinder under Ohio law. Importantly, federal courts have not adopted the alternate consideration of whether the evidence as to each set of charges is simple and distinct. The applicability of the simple-and-distinct test has recently been confirmed by the Ohio Supreme Court. *See State v. Ford*, Slip Opinion No. 2019-Ohio-4539, ¶ 104 (when the evidence is "simple and distinct," an accused is not prejudiced by joinder regardless of the nonadmissibility of evidence of the crimes as other acts under Evid.R. 404(B)). Thus, if the state can meet the requirements of the "simple and direct test," it need not meet the requirements of the stricter "other acts test." *Franklin*, 62 Ohio St.3d at 122, 580 N.E.2d 1.

{¶19} Because the evidence relating to each set of counts was simple and distinct, Rosemond cannot show that he was prejudiced by the joinder of the counts in a single trial. We overrule his first assignment of error.

### Unrecorded Sidebars

{¶20} In his second assignment of error, Rosemond claims that the trial court erred and violated his right to a public trial when it failed to record 15 sidebar conferences during the course of the trial. Crim.R. 22 requires the recording of sidebar conferences in serious-offense cases. *State v. Davis*, 1st Dist. Hamilton No. C-130198, 2014-Ohio-794, ¶ 13, citing *State v. Brewer*, 48 Ohio St.3d 50, 60-61, 549 N.E.2d 491 (1990), and *State v. Keenan*, 81 Ohio St.3d 133, 139, 689 N.E.2d 929 (1998). Under the rule, the failure to record sidebar conversations is error. *Davis* at ¶ 15. But the requirement "does not mean that the trial record must be perfect for the purposes of appellate review." *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-

5283, 855 N.E.2d 48, ¶ 158, quoting *State v. Palmer*, 80 Ohio St.3d 543, 687 N.E.2d 685 (1997), syllabus. The defendant must also show prejudice, and "prejudice will not be presumed from the mere existence of * * * unrecorded bench and chambers conferences * * *." *Palmer*.

{**¶21**} Rosemond has acknowledged that this court has addressed this issue on several occasions. He first argues that our previous cases have only addressed situations in which the trial court had, after failing to record sidebar discussions, summarized what had occurred during the unrecorded discussions. Rosemond concludes that "due to the absence of detailed summaries, this court should reverse Mr. Rosemond's conviction[s] without a prejudice analysis because the failure to provide detailed summaries amounts to a flagrant violation of Crim.R. 22."

{**¶22**} In essence, Rosemond claims that such a failure constitutes structural error. "Structural errors," defy analysis by "harmless error" standards because they "affect[ ] the framework within which the trial proceeds, rather than simply [being] an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 309-310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Consequently, a structural error mandates a finding of "per se prejudice." *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 9.

{**¶23**} In determining whether an alleged error is "structural," we begin with the inquiry of whether the alleged error "involves the deprivation of a constitutional right." *Id.* at ¶ 18. "[T]he trial-error/structural-error distinction is irrelevant unless it is first established that constitutional error has occurred." *State v. Esparza*, 74 Ohio St.3d 660, 662, 660 N.E.2d 1194 (1996). While Rosemond only argues that the violation of Crim.R. 22 is the basis for his argument, he separately argues that the failure to record the sidebar conversations violated his constitutional right to a public

trial. And so we will consider whether the failure to record the sidebar conversations in this case amounted to a violation of Rosemond's constitutional rights.

{¶24} The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." Section 10, Article I, of the Ohio Constitution also guarantees an accused the right to a public trial. Rosemond has cited no authority to support his argument that the failure to record sidebar discussions violates a criminal defendant's right to a public trial. Our research has also found no such authority. So, as a case of first impression, we consider the question by examining the nature of the right to a public trial.

{¶25} As the Eighth Appellate District has noted, the right to a public trial has historically been recognized as

> a safeguard against possible infringements by the court against the accused. An open courtroom is necessary to preserve and support the fair administration of justice because it encourages witnesses to come forward and be heard by the public, discourages perjury by the witnesses, and ensures that the judge and prosecutor will carry out their duties properly. Also, a public trial allows the general public to see that the defendant is "fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions."

*State v. Grant*, 8th Dist. Cuyahoga No. 87556, 2007-Ohio-1460, ¶ 12, quoting *Waller v. Georgia*, 467 U.S. 39, 43, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984).

{¶26}   Nothing about the rationale for the constitutional guarantee, or the cases that have outlined its protection, lead to the conclusion that the failure to transcribe sidebar conversations violates a criminal defendant's right to a public trial.  Caselaw applying the right to a public trial addresses litigation in which the proceedings were closed to the public for a limited period of time, *see State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038 (closure during the cross-examination of a witness), *State v. Morris*, 157 Ohio App.3d 395, 2004-Ohio-2870, 811 N.E.2d 577 (1st Dist.) (closure during sentencing hearing), or excluding certain spectators, *see State v. Moton*, 2018-Ohio-737, 107 N.E.3d 203 (8th Dist.).  Both implicate the protection.

{¶27}   The commonality among the caselaw is that the constitutional right to a public trial centers around members of the public having access to the proceedings and the opportunity to observe them as they occur.  It is this safeguard that both ensures that the proceedings are conducted fairly and assures the public that justice is being done.  There is nothing about this constitutional protection that implicates the manner in which the record of the proceedings is maintained for review later, and we see no reason to expand that line of jurisprudence to do so.

{¶28}   Since the failure to record sidebar discussions during a trial does not implicate a constitutional right, that failure cannot constitute structural error.  *See State v. Issa* 93 Ohio St.3d 49, 74, 752 N.E.2d 904 (2001) (Cook, J., concurring).  Therefore, Rosemond's protestations notwithstanding, we must consider the question of prejudice and his failure to preserve the record.

{¶29}   Rosemond concedes that he did not object to the failure to record sidebar conversations.  "[T]he defendant must show prejudice from the failure to record, especially where the defendant does not object to the procedure employed by

the court." *State v. Hackney*, 1st Dist. Hamilton No. C-150375, 2016-Ohio-4609, ¶ 44. "We will not reverse because of unrecorded proceedings when the defendant failed to object and fails to demonstrate material prejudice." *Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 135.

{¶30} This court has repeatedly held that this prejudice is established by demonstrating the substance of the sidebar conversations through the supplementation of the record pursuant to App.R. 9(C). *See State v. Hendrix*, 1st Dist. Hamilton No. C-150194, 2016-Ohio-2697, ¶ 34. Rosemond argues that these cases are distinguishable because the trial court had summarized the sidebar conversations therein, whereas in this case no summaries were placed on the record. But Rosemond misunderstands the significance of those summaries in our previous jurisprudence. Those cases did not turn on the presence or absence of summaries. Rather, this court held that, because the defendants had not supplemented the record pursuant to App.R. 9(C), they were left with the starting point that the trial court had accurately summarized the unrecorded conversations. As this court reasoned,

> Here, Davis has not prepared a statement pursuant to App.R. 9(C), but instead attempts to rely on the trial court's summary of the sidebar conferences, which he argues is equivalent to the reconstruction of the record required by App.R. 9. Although Davis failed to comply with App.R. 9(C), we find that his failure did not result in a waiver of this issue on appeal or prevent us from effectively reviewing the record because the record does contain a transcription of the trial court's summaries. By failing to supplement the record, and by relying on the summaries proffered by the trial court, Davis has accepted the trial

court's summaries as accurate representations of what took place during the unrecorded sidebar conferences.

*State v. Davis*, 1st Dist. Hamilton No. C-130198, 2014-Ohio-794, ¶ 14. Thus, the summaries did not affect our analysis; they instead served as the substitute for the App.R. 9(C) summaries for the purpose of determining the content of the unrecorded sidebar discussions.

{¶31} So while the absence of summaries by the trial court differentiates this case from our previous jurisprudence, their absence made it even more important for Rosemond to have supplemented the record in order to establish that he had been prejudiced by the failure to record the sidebar discussions. Without that information, we are unable to determine whether the failure to record the exact discussions prejudiced Rosemond in the prosecution of his appeal. The mere failure to record them is, on its own, insufficient. As Rosemond failed to object to the unrecorded sidebar discussions and has failed to demonstrate prejudice, we overrule his second assignment of error.

### Ineffective Assistance

{¶32} In his third assignment of error, Rosemond claims that his trial counsel was ineffective for failing to file a m0tion to suppress the evidence seized when law enforcement searched the apartment in the Fay Apartments. We disagree.

{¶33} In establishing a claim of ineffective assistance of trial counsel, a defendant must make a two-part showing. The defendant must first show that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1986). The defendant must then show that this deficient performance prejudiced his or her defense. This requires a

13

showing that counsel's errors were so serious as to deprive the defendant of a fair trial—the result of which was unreliable. *Id.* In other words, but for counsel's errors, there is a reasonable probability that the outcome of the trial would be different. *Id.* at 694. Unless a defendant makes both showings, "it cannot be said that the conviction * * * resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* As to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

{¶34} Our analysis of this issue begins by noting that the "failure to file a suppression motion does not constitute per se ineffective assistance of counsel." *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000), citing *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). Thus, the failure to file a motion to suppress constitutes ineffective assistance of counsel only when the record establishes that the motion would have been successful if made. *In re M.E.*, 1st Dist. Hamilton No. C-140586, 2015-Ohio-3663, ¶ 7. However, even when *some* evidence in the record supports a motion to suppress, we presume that defense counsel was effective if "the defense counsel could reasonably have decided that the filing of a motion to suppress would have been a futile act." *State v. Edwards*, 8th Dist. Cuyahoga No. 69077, 1996 WL 388761, *2 (July 11, 1996), citing *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1982).

{¶35} Rosemond claims that police needed a search warrant before entering the apartment at the Fay Apartments in the first instance. The state counters that law enforcement only entered the apartment for the limited purpose of ascertaining if Rosemond was inside. While executing this protective sweep, the state continues,

the contraband was in the open, and the officers saw it incidentally to that protective sweep.

{¶36} Because a motion to suppress was not filed, what little we know about the nature of the search in this case came forth during the trial. Officer Wilson testified that he tried the key he had retrieved from Bailey in the door, and it fit the apartment. He then testified that "we did a protective sweep of the apartment to secure the scene for a search warrant." During that sweep, officers saw a digital scale on the kitchen counter that appeared to have white residue on it. After police determined that no one was in the home, they secured the apartment and obtained a search warrant.

{¶37} This court addressed the issue of the need to secure a location when it is possible that a person may be inside in *State v. Martin*,

> Because of the presumption of unreasonableness that attaches to all warrantless home entries, the burden is on the government to demonstrate exigent circumstances. *Welsh v. Wisconsin*[, 466 U.S. 740, 750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984)]. In determining whether the government has met its burden, no single fact is considered dispositive; rather, the totality of the circumstances must demonstrate that the law enforcement agents were confronted with a compelling need to make an immediate entry. *United States v. Crespo*[, 834 F.2d 267 (2d Cir.1987).] * * * The circumstances must demonstrate all the following: (1) clear evidence of probable cause; (2) a crime of sufficient severity; (3) likely destruction of evidence; (4) an intrusion only of the scope necessary to protect the evidence; and (5) clearly defined indicators of exigency that are not subject to police

15

manipulation or abuse. *United States v. Aquino*[, 836 F.2d 1268, 1270 (10th Cir.1970)].

While the presence of contraband does not, without more, give rise to exigent circumstances, there is a recognition that in narcotic cases the need to invoke the exigent-circumstances exception may be "particularly compelling" given the relative ease with which narcotics in powder or chemical form can be quickly destroyed. *See United States v. Tobin*[, 923 F.2d 1506, 1509 (11th Cir.1991), *certiorari denied* 502 U.S. 907, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991), citing *United States v. Young*, 909 F.2d 442, 446 (11th Cir.1990).]

The test for whether exigent circumstances exist is an objective one. *Young*, *supra*, at 446. "The appropriate inquiry is whether the facts * * * would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured." *Id.*, quoting *United States v. Rivera*[, 825 F.2d 152, 156 (7th Cir.1987), *certiorari denied*, 484 U.S. 979, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987)].

*State v. Martin*, 1st Dist. Hamilton No. C-040150, 2004-Ohio-6433, ¶ 22-24.

{¶38} In this case, officers had seen the vehicle which Bailey was driving speed past them. At that time, there were two adults in the vehicle. By the time they found the vehicle a few minutes later, there was only Bailey. At that point, officers knew that there was an adult unaccounted for. Officers then discovered drugs in the vehicle and that Bailey had lied about having an apartment at the Fay Apartments. The officers in this case could reasonably have believed that the unknown individual had made his or her way back to the apartment for the purpose of destroying evidence.

16

{¶39}    But we need not decide whether this would have been enough to justify the protective search of the apartment.  Even if the officers had not been justified in entering the apartment in order to preserve the scene, the evidence would have been found, because they subsequently obtained a search warrant.  Rosemond does not argue that the warrant the officers relied upon was based on insufficient probable cause, and he does not argue that the warrant relied on evidence obtained during the protective sweep.  The only evidence of the chronology is the single statement by the officer that "we did a protective sweep of the apartment to secure the scene for a search warrant."  And the evidence demonstrated that the scale was in plain view upon entry of the apartment.

{¶40}    Rosemond argues that the state has the burden to show "within a reasonable degree of probability that police would have discovered the evidence independent from the unlawful conduct."  That would be true had a motion to suppress been filed, and the state had then been required to defend the seizure.  But under the procedural posture of this assignment of error, Rosemond has the burden to show that the evidence would not have been admitted.  As the Ohio Supreme Court noted, "To establish ineffective assistance of counsel for failure to file a motion to suppress, a defendant must prove that there was a basis to suppress the evidence in question."  *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 65.

{¶41}    On this record, we cannot say that a motion to suppress the evidence seized from the apartment would have been successful.  "Where the record contains no evidence which would justify the filing of a motion to suppress, the appellant has not met his burden of proving that his attorney violated an essential duty by failing to file the motion."  *State v. Tibbetts*, 92 Ohio St.3d 146, 166, 749 N.E.2d 226 (2001),

citing *State v. Gibson*, 69 Ohio App.2d 91, 95, 430 N.E.2d 954 (8th Dist.1980). Rosemond has failed to establish that counsel was ineffective for failing to file a motion to suppress. We overrule Rosemond's third assignment of error.

**Expert Testimony**

{¶42} In his fourth assignment of error, Rosemond claims that the trial court abused its discretion when it allowed Cincinnati Police Criminalist David Landesberg to testify regarding the reconstruction of the bullet trajectory of the rounds fired during the December 8 shooting because the state failed to comply with Crim.R. 16(K).

{¶43} Landesberg was a witness who testified for the state. He was one of the criminalists who investigated the crime scene and helped with the investigation. He testified about where the bullet casings were found and to the estimated trajectories the bullets traveled through the car the victim was in during the shooting. When Landesberg began to testify regarding the trajectory estimations he had documented on a chart—which was being offered into evidence—defense counsel objected

> to the aspects of the trajectory. We believe that is something that would require expert testimony. One, we don't believe that this witness has been qualified as an expert [to give] testimony in trajectory analysis. Second, we would submit that the prosecutor hasn't complied with 16-K, in that there has been - - while that document there has been provided but in a separate report or a summary of the qualifications of this witness 21 days prior to trial. [sic] So we would object to it being admitted.

{¶44} In response, the state countered that the chart, which had been provided, was the report. While the state seemed to concede that the specialist's curriculum vitae ("C.V.") had not been submitted, it was available to the defense upon request. Defense counsel countered that the state had the affirmative duty to provide it, and it was not on the defendant to request it. The trial court then offered to recess to allow defense counsel to review Landesberg's C.V. The state suggested that such a continuance was the appropriate remedy for the failure to comply with Crim.R. 16. The trial court recessed the proceedings, at which point it indicated it would make a decision on the issue. When the transcript resumes, however, it begins with the continued questioning of Landesberg by the state about the bullet trajectory without reference to the matter any further.

{¶45} On appeal, the state responds that Landesberg was not testifying as an "expert witness," and that, alternately, the trial court's remedy of continuing the matter to allow defense counsel to review Landesberg's C.V. was an acceptable alternate remedy.

{¶46} In the past several months, this court has had several opportunities to address the issue of the failure to comply with Crim.R. 16(K). In the first case, the court discussed the failure of the state to comply with Crim.R. 16(K) in the context of a personal crimes detective testifying as an expert witness on the subject of "investigating child abuse and neglect." *State v. Hall*, 1st Dist. Hamilton No. C-170699, 2019-Ohio-2985. Over defense counsel's objections, the state qualified the detective as an expert witness, who gave testimony about various aspects of child-sexual assault. *Id.* at ¶ 14-17. This court noted that the detective was the last witness to testify, that the testimony was important in securing the conviction in the case, and the state relied on it heavily during its closing argument. *Id.* at ¶ 19. The court

19

concluded that allowing the testimony was a clear violation of Crim.R. 16(K), and then determined whether the testimony had resulted in prejudice. *Id.* at ¶ 20. This court concluded that the defendant had been prejudiced because the testimony, in conjunction with a series of improper statements made by the state in closing argument, was crucial to securing the conviction. *Id.* at ¶ 39.

{¶47} In the second case, the court discussed the failure of the state to comply with Crim.R. 16(K) in the context of a police officer who testified in the prosecution of a defendant charged with murder after she had run over a pedestrian with a vehicle. *State v. Benson*, 1st Dist. Hamilton No. C-180128, 2019-Ohio-3255. In that case, the officer was not initially presented as an expert witness, but the officer subsequently rendered an expert opinion relating to how the events had transpired based on his observations of video footage and physical evidence. *Id.* at ¶ 19. The court found that the admission of the testimony was error, but that the error was harmless because of the overwhelming other evidence of the defendant's guilt. *Id.* at ¶ 32-34.

{¶48} In the third case, the court discussed the failure of the state to comply with Crim.R. 16(K) in the context of a police officer who testified regarding fingerprint comparison. *State v. Johnson*, 1st Dist. Hamilton No. C-170354, 2019-Ohio-3877. In that case, the state offered the testimony as expert testimony and the defendant claimed on appeal that the officer had not been qualified as an expert and had not provided a report. The state argued that it had provided an expert report in the form of an evidence examination worksheet that contained the results of the fingerprint analysis. This court concluded that the witness was qualified to testify as an expert, but could not determine whether the state had failed to provide a Crim.R.

16(K) report because the "evidence examination worksheet" was not in the record. *Id.* at ¶ 42.

{¶49} Pursuant to this recent jurisprudence on the issue, our analysis of a claimed violation of Crim.R. 16(K) involves two steps. First, we must determine whether it was error for the trial court to admit the testimony of Landesberg. *See Hall* at ¶ 20; *Benson* at ¶ 31; *Johnson* at ¶ 42. Upon determining that such an error has occurred, we then must determine whether the error was harmless. *Hall* at ¶ 20; *Benson* at ¶ 32.

{¶50} We first determine that Landesberg did present expert testimony in this case. During his direct examination, the state asked, "Do you have any expertise that other crime scene analysts may not have with respect to bullet properties?" Landesberg answered that he had been trained in shooting reconstruction, which he described as

> It allows us to determine our make approximations about the bullet
> path. In this case we're looking at the angles at which the bullets hit
> the vehicles. So I was able to go - - to back and determine some of
> these angles. Their approximations, we take - - we measure an angle
> and we give it 5 degrees of tolerance in either direction.

Landesberg then explained the rationale behind giving the five-degree tolerance, citing the fact that bullets react to striking different materials in different ways. The state then asked, "With your expertise in bullet trajectory, do you have an understanding of how the different types of weapons that might be used operate and function?" Landesberg testified that, based on his experience, the shooters were standing near where the casings were found. Landesberg then testified to the various bullet trajectories for the 23 noted bullet impacts on the vehicle the victims were in.

21

He could not testify as to which bullets hit which victims and could not testify who had done the shooting. This is not lay opinion testimony, as the state suggests on appeal. This is not a case where one shot was fired and there were two holes to connect. This was a complicated shooting scene that required Landesberg to use his expertise to analyze. For example, the diagram shows three shots fired through the front windshield, and five shots fired through the rear passenger door, but only four terminated in the rear passenger seat. This reconstruction is beyond the knowledge of a lay person.

{¶51} Having determined that Landesberg provided expert testimony, we further conclude that the state failed to provide an expert "report." According to Crim.R. 16(K), the expert must provide a "written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications." The only thing the state provided to the defense was a diagram of the trajectories and no summary of the expert's qualifications. This is insufficient to satisfy the requirement, and the state does not argue otherwise on appeal.

{¶52} Considering the above, we conclude that the trial court erred when it allowed Landesberg to testify. But such an error may still have been harmless. In order to determine whether the erroneous admission of evidence is harmless pursuant to Crim.R. 52(A), we must determine that the right affected by the error is "substantial" and then whether reversal is warranted because the accused was prejudiced. *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 24. Evaluating prejudice requires examining "the error's impact on the verdict and the weight of the remaining evidence * * *." *Hall*, 1st Dist. Hamilton No. C-170699, 2019-Ohio-2985, at ¶ 20, quoting *Morris* at ¶ 25. As we stated in *Hall*, three

considerations emerge: 1) the defendant must suffer prejudice as a result of the admission of the improper evidence, 2) the appellate court must believe that the error was not harmless beyond a reasonable doubt, and 3) the court must excise the improper evidence and evaluate the evidence remaining to determine whether a new trial is required. *Hall* at ¶ 20, citing *Morris* at ¶ 27-29.

{¶53} In *Hall*, this court concluded that the defendant had been prejudiced by the admission of the testimony because the testimony was highlighted by the state throughout a large portion of the case and was heavily relied upon in closing argument. *Hall* at ¶ 21. The testimony bolstered the credibility of other witnesses, explained the lack of physical evidence, and explained the reason for delayed reporting. *Id.* at ¶ 21-23. In this case, on the other hand, Rosemond has not argued how the testimony prejudiced him. The closest he comes is in his reply brief, when he states, "the existence of multiple individuals at the crime scene, both with and without guns, rendered any reconstruction evidence of particular import." But the only expert testimony that Landesberg provided was to the path of the various shots and the approximate locations from where they were fired. Nothing implicated Rosemond in this testimony as Landesberg did not opine the identity of any of the shooters. Nor did he testify as to which shots caused injuries to which victims. Further, this testimony did not strengthen or bolster other testimony, and the state did not refer to it at all in its closing argument.

{¶54} Having reviewed the improper testimony of Landesberg, in light of the record as a whole, we conclude that Rosemond was not prejudiced by the testimony, and that it was harmless beyond a reasonable doubt. Reviewing the entire record, absent consideration of Landesberg's improper testimony, we conclude

that the outcome of the proceedings below would not have been different. We overrule Rosemond's fourth assignment of error.

## Admission of Evidence

{¶55} In his fifth assignment of error, Rosemond argues that the trial court erred when it admitted various evidence. First, he claims that the state failed to properly authenticate the video evidence produced from the Schwarz Market. Second, he claims that the state failed to properly authenticate the license plate reader report. Third, he claims that the testimony about what Bailey's son said in the car was inadmissible hearsay. Fourth, he claims that the recordings of calls that Rosemond made while incarcerated were improperly admitted. He then claims that the trial court improperly allowed the state to impeach its own witness. Finally, he argues that the cumulative effect of the previous claimed errors collectively prevented him from having a fair trial. We will address each argument in turn.

## Authentication of Video Evidence

{¶56} One of the key pieces of evidence in the state's case against Rosemond was the video recording of the incident captured by cameras at the Schwarz Market. Police obtained a copy of the video on compact disc. At trial, store employee Zuhair Al-hayek testified as to the identity of the recording. Al-hayek had not created the disc, and he did not testify as to how the security system operated. He did, however, explain the orientation of the system and said that he had seen the video several times, testifying that it was the same video that detectives watched at the store immediately after the incident. Additionally, Detective Gehring testified that he had reviewed the video and testified that it was the same footage that he had been shown at the Schwarz Market.

{¶57} Evid.R. 901(A) states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Put another way, "[t]he authentication requirement is satisfied when the proponent presents foundational evidence or testimony from which a rational jury may determine that the evidence is what its proponent claims it to be." *State v. Crossty*, 1st Dist. Hamilton No. C-170085, 2017-Ohio-8382, ¶ 29. This court has stated that "[t]his burden is not great, and only requires a prima facie showing through direct or circumstantial evidence." *Id.*

{¶58} Photographic evidence, including videotapes, can be admitted under two theories. Under the pictorial-testimony theory, evidence is admissible "when a sponsoring witness can testify that it is a fair and accurate representation of the subject matter, based on the witness' personal observation." *Midland Steel Prod. Co. v. U.A.W. Local 486*, 61 Ohio St.3d 121, 129-130, 573 N.E.2d 98 (1991); *State v. Hoffmeyer*, 9th Dist. Summit No. 27065, 2014-Ohio-3578, ¶ 19. Under the silent-witness theory, photographic evidence is a "silent witness," which "speaks for itself, and is substantive evidence of what it portrays independent of a sponsoring witness." *Midland Steel* at 129-130; *State v. Maiolo*, 2d Dist. Clark No. 2015-CA-15, 2015-Ohio-4788, ¶ 11. Under that theory, evidence is admissible "upon a sufficient showing of the reliability of the process or system that produced the evidence." *Midland Steel* at 130; *Hoffmeyer* at ¶ 19. No expert testimony is required to substantiate the reliability of the surveillance system. *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 151; *Midland Steel* at 130.

{¶59} The evidence presented to the trial court was arguably insufficient to meet the test for the "silent witness" version of pictoral authentication. Al-hayek

25

testified in some detail about the layout of the system, but did not truly testify as to its operation. However, both Al-hayek and Gehring testified that the video played at trial was identical to the video recording that they had each seen at the store. And other than the objection itself, there was no real contention below that the video was other than what it purported to be. Since, again, the threshold for authentication is low, we cannot say that the trial court abused its discretion when it determined that the video had been sufficiently authenticated.

**Foundation for License Plate Reader**

{¶60} Rosemond next argues that the trial court abused its discretion when it allowed a police officer to authenticate images that she obtained from a Vigilant Solutions license plate camera that was located at the corner of President Drive and Baltimore Avenue. The officer was employed by the Cincinnati Police Department and worked out of District Three. She explained that the camera is a "stationary camera that reads license plates and it documents them in a database." She testified that "any vehicle that goes past that stationary camera, it will capture an image of the vehicle and its license plate." She said that this information is then stored in a database maintained by Vigilant Solutions. She testified that she has a login for the system and that she had used it "too many times to count." She testified that Vigilant Solutions maintains the database for law enforcement use.

{¶61} Like the video evidence, the pictures of the license plates were identified by an individual with an imperfect understanding of how the system works. But the officer had used the system countless times and testified that the results had been reliable. She testified to how the system basically functioned and how she interacted with it. From this testimony, it was not an abuse of discretion to

conclude that the state had made a "sufficient showing of the reliability of the process or system that produced the evidence." *See* Evid.R. 901(A).

**Testimony About Statements of Child**

{¶62}   Rosemond next argues that the trial court abused its discretion when it allowed officer Wilson to testify to what Bailey's son had told him during the December 3 traffic stop.  Wilson testified that Bailey's son had said that his father had been in the car and that he had jumped out and run away.  Rosemond claims that the statement was hearsay; the state claims that the statement was an excited utterance—an exception to the prohibition against the admission of hearsay statements.

{¶63}   Generally, "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" is not admissible.  *See* Evid.R. 801(C); Evid.R. 802.  However, a statement may be admitted if it would otherwise qualify as hearsay if the statement meets one of the exceptions outlined in either Evid.R. 803 or 804.

{¶64}   An "excited utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  Evid.R. 803(2); *see State v. Wallace*, 37 Ohio St.3d 87, 88, 524 N.E.2d 466 (1988).  Such statements are admissible because they are the product of reactive, not reflexive, thinking, and therefore carry guarantees of trustworthiness. *State v. Taylor*, 66 Ohio St.3d 295, 300, 612 N.E.2d 316 (1993).  In order to qualify as an excited utterance, the following factors must be established: (1) there was an event startling enough to produce a nervous excitement in the declarant, (2) the statement must have been made while under the stress of excitement caused by the event, (3) the statement must relate to the startling event, and (4) the declarant must

have had an opportunity to personally observe the startling event. *State v. Riggins*, 1st Dist. Hamilton No. C-180069, 2019-Ohio-3254, ¶ 33, citing *State v. Boles*, 190 Ohio App.3d 431, 2010-Ohio-5503, 942 N.E.2d 417, ¶ 34 (6th Dist.).

{¶65} In this case, the child was crying in the back seat of the car. When the officer initially noticed him, he said that the child "was in the back. He was upset. He was crying. I think he was - - he seemed kind of scared." It was at that point that the officer asked the child if anyone else had been in the car. The child said that his father "Ant" had been in the car. This evidence meets the requirements of an excited utterance, and Rosemond has not argued otherwise.

### Admission of Jail Call

{¶66} Rosemond next argues that one of the recorded jail calls should not have been admitted because its probative value was substantially outweighed by the danger of unfair prejudice. The call recorded an argument between Rosemond and a woman named "Brie." In that argument, Brie threatened to testify against Rosemond at trial. Rosemond in turn threatened Brie. Since a portion of the state's theory of the case involved the intimidation of witnesses, the conversation was relevant, if only just. The trial court did not abuse its discretion when it determined that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See* Evid.R. 403.

### Impeachment of Witness

{¶67} Rosemond next argues that the trial court abused its discretion when it refused to allow him to cross-examine Nared using photographs of Nared holding various guns. During his direct testimony, Nared denied that he had gone to the Schwarz Market to sell a gun. He also denied that anyone in the car had a gun at the time of the shooting. He did not say that he had never had a gun. The use of the

photos of Nared with guns at other times would not have contradicted what he had testified to on direct examination. Rosemond argues that the "pictures showed that Mr. Nared habitually carried guns." In order for evidence of habit to be admissible, it must establish a regular or routine practice. Evidence as to one or two isolated occurrences does not establish a sufficient regular practice for admission pursuant to Evid.R. 406. *Bollinger, Inc. v. Mayerson*, 116 Ohio App.3d 702, 715, 689 N.E.2d 62 (1st Dist.1996), citing *Cannell v. Rhodes*, 31 Ohio App.3d 183, 509 N.E.2d 963 (8th Dist.1986). The photos were insufficient to establish that Nared had a habit of carrying guns.

### Cumulative Error

{¶68} Finally, Rosemond claims that the cumulative effect of the errors outlined above was such that his trial was rendered unfair. Under the cumulative-error doctrine, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995), citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus. But the cumulative-error doctrine does not apply where the defendant "cannot point to 'multiple instances of harmless error.' " *See State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 148. Rosemond has failed to point to multiple instances of harmless error. We overrule his fifth assignment of error.

### Prosecutorial Misconduct

{¶69} In his sixth assignment of error, Rosemond claims that his right to a fair trial was violated by several instances of prosecutorial misconduct. Rosemond

first claims that the state used inflammatory language throughout the trial. He also complains that the state improperly referred to the scenes involved as "high-crime volume areas" for the purposes of conditioning the jury to be predisposed to finding him guilty because he was from such an area.

{¶70} The test for whether prosecutorial misconduct mandates reversal is whether the prosecutor's remarks or actions were improper, and, if so, whether they prejudicially affected the substantial rights of the accused. *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 21, ¶ 45. The core of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 110, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶71} Rosemond cites a number of instances of highly colorful language used by the state during the course of the trial. The state said that Rosemond had "shot up people," talked about how the victims had been "gunned down," and how the deceased had been "executed." Rosemond said that the state used "dog-whistling language" because the prosecutor said that the people involved "don't speak the King's English," instead of saying that they used slang. The prosecutor also told the prospective jury during voir dire that they may see people involved in the shooting in the public gallery. At one point, the state referred to "bad actors, the thugs like this defendant." The trial court instructed the jury to disregard that comment. Additionally, Rosemond claims that the state's repeated references to the area as a "high-crime volume area" were improperly used to buttress the state's claims that witnesses were afraid to testify, and that Rosemond was guilty by association because he lived in such a neighborhood. During closing argument, the state referred to

Rosemond as "not the smartest guy to ever walk the earth" and as "not a rocket scientist."

{¶72} As this court has noted, counsel is permitted to be "colorful or creative" as long as his comments are supported by the record and the defendant receives a fair trial. *State v. Steelman*, 2018-Ohio-1732, 111 N.E.3d 923, ¶ 28 (1st Dist.), citing *State v. Brown*, 38 Ohio St.3d 305, 317, 528 N.E.2d 523 (1988). So, when the evidence supports it, a prosecutor may refer to a defendant as a "two-bit junkie," "two-bit addict," "two-bit heroin addict," and "junkie," as well as "some yahoo," and a "vindictive, violent individual." *Steelman* at ¶ 27. The prosecutor can refer to the defendant as a "trained killer." *State v. Tibbetts*, 92 Ohio St.3d 146, 168, 749 N.E.2d 226 (2001). The defendant can also be referred to as a "mean-spirited derelict" and an "unemployed killer." *State v. Nields*, 93 Ohio St.3d 6, 37, 752 N.E.2d 859 (2001). Or, as this court has noted, defendants can be called "bad people," "drug dealers," "executioners," "thugs" and "sharks." *State v. Tolbert*, 70 Ohio App.3d 372, 382, 591 N.E.2d 325 (1st Dist.1990).

{¶73} This court has reviewed the entirety of the record in this case, including the transcript of what was a lengthy, and at times contentious trial. Having considered the cited conduct in the context of the entire proceedings, we cannot say that Rosemond did not receive a fair trial because of the comments made by the prosecutor. The state's theory of the case was that the victim was executed for having testified in another murder trial. This execution was an example of the fear many felt in the community about testifying at trial. These factors were part of the state's theory of the case, and the fact that it was described "colorfully" does not mean that the trial was unfair. We overrule Rosemond's sixth assignment of error.

**Sufficiency/Weight**

{¶74} In his seventh assignment of error, Rosemond claims that his convictions were based upon insufficient evidence and were contrary to the manifest weight of the evidence. In a challenge to the sufficiency of the evidence, the question is whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In reviewing a challenge to the weight of the evidence, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *Id.*

**Counts 10-15**
**The Drug and Weapon Counts**
**December 3, 2015**

{¶75} Rosemond makes several arguments relating to the last six counts of the indictment, arising from the December 3, 2015 traffic stop and subsequent Fay Apartment search. He first claims that the stop of Bailey's vehicle did not link him to the contents of the apartment that was subsequently searched. He argues that "his alleged escape from the Mustang did nothing to prove whether he resided at or frequented the Nottingham Drive apartment." He further argues that the evidence found in the residence connected only Bailey to the contraband found in the apartment. He also argues that the jailhouse calls did not credibly link him to the contraband. And then he argues that he could not be tied to the apartment simply because there was clothing found there that would fit a man of his size.

{¶76} The evidence presented at trial, however, was more comprehensive than Rosemond would suggest. When the Mustang was first seen, there were two adults in the front. When police eventually stopped the car, there was only the driver. Rosemond insinuates that the police somehow coerced Bailey's son into saying that he was the one who jumped out of the vehicle. But, at the time the child made that statement, the record seems to indicate that the officers had no idea who the other person was. The statement was made before Rosemond's identification card was found in the Pelle Pelle jacket. The drugs found in the car were found on the passenger's side of the car, where Rosemond had been sitting.

{¶77} Additionally, other evidence provided circumstantial links between Rosemond and the apartment and its contents. There were a number of clothing items that would have fit someone of Rosemond's larger size. But, more significant than that, the series of recorded jail calls between Rosemond and Bailey made it relatively clear that, while there was no actual DNA evidence found on any of the contraband, Rosemond believed that it would be. The calls from Rosemond to Bailey began the day he was arrested and brought to the Hamilton County Justice Center. He asked her to get rid of various items, providing evidence that they were working together in a criminal enterprise. He said that "they made me take DNA for them guns." He then referred to the two guns in the apartment. In another call, he essentially admitted the drugs where his when he told Bailey "he didn't even charge me with the dope, though. You hear me? He doesn't understand. Why they asking me about the guns but not my drugs that were in that house too?" In another call, Rosemond is talking to another person about Bailey, and he says, "But I'm gonna tell her, like, man, my DNA all over that shit; the drugs and the guns." In another call, he says, "No, I am talking about the drugs. They got my DNA on the drugs."

{¶78}   Rosemond believed that his DNA would be or had been found on the contraband seized from the apartment.  And his flight from the vehicle when police attempted to stop the Mustang was further evidence of his consciousness of guilt.

{¶79}   In this case, there was more than enough circumstantial evidence to link Rosemond to the drugs and weapons seized on December 3, 2015.

**Counts 1-9**
**The Murder and Related Counts**
**December 8, 2018**

{¶80}   Rosemond further claims that there was no evidence connecting him to the shooting at the Schwarz Market on December 8, 2018.  He claims that the only evidence presented was that he was present at the scene at the time of the shooting.  He notes that, while the "professional witnesses" provided "interesting" testimony about the shooting, none of the testimony linked him to the crimes other than minimal gunshot residue on his coat.  He also argues that none of the eyewitnesses credibly identified him as one of the shooters.  He then argues that the video evidence does not conclusively show that he was involved in the incident, and that it was law enforcement's early focus on him that prevented them from investigating other leads that would have led them to the real perpetrators.

{¶81}   At trial, Ariontez Nared testified as a court witness.  He admitted that he did not want to be in court and that he had told prosecutors that he had been hit by a bus rather than shot in order to try to get out of having to testify.  He had been sitting in the front passenger seat of the car.  When the group arrived at the Schwarz Market, he got out of the car and went into the store.  He said that he had been walking back to the car when he was shot.  He said that, over his shoulder, he saw Rosemond and a muzzle flash.  He testified that all four of the men who had been in the car had been shot and that there were multiple shooters.  This testimony was

corroborated by the testimony of firearms expert Ben Jeschke, who testified that there were multiple guns used during the shooting.

{¶82} Other evidence implicated Rosemond as well. In the jail-call recordings, Rosemond jokes about how Nared, who had been "hit with my shit," was telling investigators he got hit by a bus. And the video recording that captured the incident clearly shows Rosemond approach the vehicle and dance around it for several seconds as if firing a weapon. The video also seems to show flashes around where only Rosemond was standing, indicating that he was shooting. It was not until the shooting had ended that Rosemond was seen fleeing from the scene. It strains credibility that someone would be so close to the scene in which multiple shooters were attacking the four men and remain there while the shooting occured, only to run when it was over. And while all the other cars in the area left, the Tahoe that Rosemond would eventually get into remained until after the shooting had ended and he had returned.

{¶83} Based upon the evidence presented at trial, Rosemond's convictions were based upon sufficient evidence and were not against the manifest weight of the evidence. We overrule his seventh assignment of error.

**Sentencing**

{¶84} In his final assignment of error, Rosemond claims that the trial court erred when it failed to properly award him jail-time credit. Jail-time credit should be awarded at the time of sentencing. *See State v. Napier*, 93 Ohio St.3d 646, 647, 758 N.E.2d 1127 (2001). In its entry, the trial court wrote "the defendant is to receive credit for days time served." Clearly, the trial court forgot to enter the appropriate number of days. The state concedes error on this point. We sustain Rosemond's eighth assignment of error.

**Conclusion**

{¶85} For the reasons set forth above, we vacate that portion of Rosemond's sentence in which the trial court failed to award his specific jail-time credit and remand this cause for the proper calculation and award of jail-time credit. The trial court's judgment is affirmed in all other respects.

Affirmed in part, vacated in part, and cause remanded.

**MYERS, J.,** concurs.
**ZAYAS J.,** concurs in part and dissents in part.

**ZAYAS J.,** concurring in part and dissenting in part.

{¶86} I concur with the majority's resolution of Rosemond's second, fourth, fifth, sixth, seventh, and eighth assignments of error. With respect to the third assignment of error, I concur that Rosemond's trial counsel was not ineffective for failing to file a motion to suppress, but for a different reason than the majority.

{¶87} However, I must respectfully dissent from the majority's conclusion that the charges related to the traffic stop were properly joined with the charges related to the shootings under Crim.R. 8(A). Offenses must first be correctly joined before determining whether the defendant is prejudiced by the proper joinder under Crim.R. 14. *See State v. Jeffries*, 2018-Ohio-2160, 112 N.E.3d 417, ¶ 57 (1st Dist.). Here, the majority concluded that Rosemond was not prejudiced by the joinder under Crim.R. 14, but it failed to first address whether the joinder was proper under Crim.R. 8(A).

**Ineffective Assistance**

{¶88} I agree that Rosemond failed to establish that his trial counsel was ineffective for failing to file a motion to suppress. However, based on this record, Rosemond did not have standing to challenge the legality of the warrantless search.

{¶89}   To prevail on a claim of ineffective assistance of counsel for failure to file a motion to suppress, the defendant must show the motion would have had a reasonable probability of success. *See State v. Nields*, 93 Ohio St.3d 6, 34, 752 N.E.2d 859 (2001). "Where the record is not clear or lacks sufficient evidence to determine whether a suppression motion would have been successful, a claim for ineffective assistance of counsel cannot be established." *State v. Parkinson*, 5th Dist. Stark No. 1995CA00208, 1996 WL 363435, *3 (May 20, 1996).

{¶90}   After Bailey was arrested for the drugs found in the car, Wilson searched the pockets of the Pelle Pelle jacket in the back seat of the car.  He found a state ID belonging to Rosemond which listed his address as 1712 Hewett Avenue, which is not located in the area of the Faye Apartments.  Wilson left the jacket in the back seat of the car but retained the identification card.

{¶91}   Wilson called 241-KIDS regarding Bailey's son.  Bailey's mother responded to the scene and took the child home with her.  Wilson also called a female officer to come to the scene and conduct a search of Bailey.  During this search, Wilson noticed that Bailey had a Faye Apartment key.  When she continued to deny that she lived in that area, Wilson ran her name through the computer system and discovered that her address was 2515 Nottingham Road, in the Faye Apartments.

{¶92}   Wilson and Brockmann drove to the apartment at 2515 Nottingham to see if Bailey's key would open the door.  According to Wilson, they were concerned that Rosemond could have gone to the apartment.  After entering the apartment, they found a digital scale on the kitchen counter with a white residue on it.  They secured the apartment and obtained a search warrant.

{¶93}   During the search, they did not find any personal papers or mail belonging to Rosemond.  Brockmann found a large pair of pants that he testified

"could belong" to a man as large as Rosemond. However, he did not collect the pants as evidence, and no photographs were taken of the pants. After they located the drugs and guns, Bailey was charged with two counts of possession of drugs, two counts of trafficking, and having a weapon while under a disability, the same charges Rosemond eventually faced. But Rosemond was not charged for the drugs and guns until he was indicted for the shootings 26 days later.

{¶94} In order to have standing to challenge a search on Fourth Amendment grounds, the accused must possess a legitimate expectation of privacy in the area searched, and the burden is on the accused to establish such expectation. *See State v. Grievous*, 12th Dist. Butler No. CA2018-05-093, 2019-Ohio-1932, ¶ 60. "A person who alleges error by the use of evidence taken from someone else's property cannot claim that his own rights have been violated. Only those whose personal rights have been violated can raise Fourth Amendment claims." *State v. Coleman*, 45 Ohio St.3d 298, 306, 544 N.E.2d 622 (1989). A defendant's status as an overnight guest at the time of the search is sufficient to show that he had a reasonable expectation of privacy in his host's home. *State v. Davis,* 80 Ohio App.3d 277, 285, 609 N.E.2d 174 (8th Dist.1992), citing *Minnesota v. Olson*, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).

{¶95} Based on this record, Rosemond could not demonstrate that he had standing to succeed on a motion to suppress. *See Parkinson*, 5th Dist. Stark No. 1995CA00208, 1996 WL 363435 at *3. Rosemond did not live at the Nottingham apartment where the drugs and gun were located. His identification card listed his address as Hewett Avenue, and the docketing statement in this case reflects his Hewett address. The search did not yield any mail or personal papers belonging to Rosemond. Other than a pair of pants that "could" be large enough to fit Rosemond,

there is no evidence that Rosemond lived there or was an overnight guest prior to the search.

{¶96} The majority concludes that the evidence of the drugs and guns would have been admissible because the officers would have inevitably discovered the evidence after obtaining a warrant even if the initial entry was unlawful. Under the inevitable-discovery exception, evidence will not be suppressed if there is a reasonable probability that the evidence would have been discovered during a lawful investigation, regardless of the state's misconduct. *See State v. Sharpe*, 174 Ohio App.3d 498, 2008-Ohio-267, 882 N.E.2d 960, ¶ 59 (2d Dist.), citing *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

{¶97} However, "police who believe they have probable cause to search cannot enter a home without a warrant merely because they plan subsequently to get one." *United States v. Griffin*, 502 F.2d 959, 961 (6th Cir.1974). The inevitable-discovery rule does not apply when the subsequently obtained search warrant is based on facts discovered during the unlawful entry. *See State v. Keith*, 178 Ohio App.3d 46, 2008-Ohio-4326, 896 N.E.2d 764, ¶ 13 (2d Dist.). Here, Wilson testified that he froze the scene and obtained a warrant based upon the digital scale that he found after entering the apartment. Therefore, I conclude that the inevitable-discovery exception would not apply under these circumstances. *See id.*

{¶98} Accordingly, I concur in judgment only with the majority's resolution of Rosemond's third assignment of error.

**Misjoinder**

{¶99} In his first assignment of error, Rosemond contends that the charges related to the traffic stop were improperly joined with the charges related to the shootings under Crim.R. 8(A) because the offenses arose from distinct incidents that

were unrelated. He further argues that even if joinder were proper, the court abused its discretion in failing to sever the charges under Crim.R. 14 because he was prejudiced by the joinder.

{¶100} The majority concludes that Rosemond did not preserve his argument regarding the improper joinder because his motion only cited to Crim.R. 14, and he "never made his argument pursuant to Crim.R. 8." Although the motion was inartfully drafted, Rosemond argued for separate trials because the alleged incidents were separate and apart, dissimilar, and of a different nature. He also argued that joinder would be prejudicial under Crim.R. 14. At the hearing on the motion, Rosemond further argued that the charges were not related in any way, were separate and distinct, and should not be tried together. The state countered that the incidents were linked because they occurred within a week of each other, both occurred in the same general area, and both involved a Pelle Pelle coat. Each made arguments relevant to Crim.R. 8 in the motion and on appeal.

{¶101} More importantly, the state did not raise the issue of waiver in its brief. The state understood that Rosemond was arguing improper joinder in addition to prejudicial joinder. The state specifically cited to Crim.R. 8 in its brief, and both parties made the proper arguments in the briefs. I cannot conclude that the issue was not argued by Rosemond when the state itself understood that it was.

{¶102} Although joinder is liberally permitted, "there are limits governing the charging of multiple offenses in the same indictment." *State v. Jeffries*, 2018-Ohio-2160, 112 N.E.3d 417, ¶ 49 (1st Dist.). Under Crim.R. 8(A), "two or more offenses may be charged in the same indictment" if the offenses are (1) "of the same or similar character"; (2) "based on the same act or transaction"; (3) "based on two or more acts or transactions connected together or constituting parts of a common scheme or

plan"; or (4) "part of a course of criminal conduct." Joinder of unrelated charges may "prejudice an [accused's] right to a fair trial" and "may create an unfavorable impression in [the jurors'] minds as to an [accused's] character before any evidence has been admitted as to his guilt or innocence." *State v. Minneker*, 27 Ohio St.2d 155, 157-158, 271 N.E.2d 821 (1971).

{¶103} Where unrelated charges are misjoined because none of the Crim.R. 8(A) requirements is met, "the trial court should grant a motion to sever, even in the absence of prejudice." *State v. Kennedy*, 2013-Ohio-4221, 998 N.E.2d 1189, ¶ 24 (1st Dist.). Whether charges are properly joined in an indictment is a question of law we review de novo. *See id.* If the joinder were not proper, we review for harmless error and reverse only if the misjoinder results in actual prejudice because it " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986), quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

{¶104} We must first determine whether the joinder is proper under Crim.R. 8(A). If joinder is proper, we then determine whether the defendant was entitled to separate trials under Crim.R. 14 because the offenses, although properly joined, resulted in prejudice to the defendant. *See* Crim.R. 14; *State v. Echols*, 128 Ohio App.3d 677, 691, 716 N.E.2d 728 (1st Dist.1998). We review a trial court's denial of a motion to sever under Crim.R. 14 for an abuse of discretion. *See State v. Washington*, 1st Dist. Hamilton No. C-090561, 2010-Ohio-3175, ¶ 47.

{¶105} Here, the state did not argue that any of the four joinder conditions applied to the traffic-stop charges and the shooting charges to permit the charges to be joined, and I cannot conclude that the offenses were properly joined.

{¶106} The charges related to the traffic stop occurred five days before the shooting and at a different location. There is no evidence that the traffic-stop charges were part of the same criminal scheme or plan as the shooting charges or part of a continuous course of conduct. The charged offenses were not of the same or similar character. The traffic-stop charges were based on drugs and two guns found in Bailey's apartment. The shooting at Schwartz Market resulted in murder charges, felonious-assault charges, and one charge of having weapons while under a disability. The gun charges connected to the drugs were not related to the shooting, and there is no allegation that the same guns were involved in both incidents. The indictment does not allege that the charges were in any way related other than the fact that Rosemond was accused of committing all of them.

{¶107} Accordingly, I conclude that the trial court erred in allowing the joinder of the charges related to the traffic stop and the charges related to the shootings. I now turn to the question of whether the improper joinder had a prejudicial effect on Rosemond's trial.

{¶108} I first note that Rosemond preserved the error for review by raising the improper joinder before trial. Although the majority is correct that the failure to renew a prejudicial joinder argument under Crim.R. 14 at the close of the evidence results in a plain-error review, that rule is inapplicable to an improper joinder under Crim.R. 8. *See State v. Mata*, 6th Dist. Sandusky No. S-80-18, 1981 WL 5600, *3 (May 22, 1981); *United States v. Chavis*, 296 F.3d 450, 457 (6th Cir.2002), quoting *United States v. Terry*, 911 F.2d 272, 277 (9th Cir.1990). A trial court must reassess whether a defendant has been prejudiced by the proper, but prejudicial, joinder based upon the evidence submitted at trial. *See Chavis* at 457, quoting *Terry* at 277. In contrast, Crim.R. 8 prohibits unrelated charges to be joined for trial, "even in the absence of prejudice."

*Kennedy*, 2013-Ohio-4221, 998 N.E.2d 1189, at ¶ 24. Thus an improper joinder argument challenges the propriety of joining unrelated charges in an indictment, and "there is no need [for the trial court] to assess what actually happened at trial." See *Chavis* at 457, quoting *Terry* at 277.

{¶109} We review an improper joinder for harmless error. *See State v. Whitsett*, 8th Dist. Cuyahoga Nos. CR-162213 and CR-163174, 1983 WL 5745, *5 (February 3, 1983); *Lane*, 474 U.S at 449, 106 S.Ct. 725, 98 L.Ed.2d 814. A violation of Crim.R. 8 will be reversed if the improper joinder resulted in prejudice. *See State v. Atkinson*, 4 Ohio St.2d 19, 22, 211 N.E.2d 665 (1965); *State v. Clements*, 98 Ohio App.2d 797, 799, 649 N.E.2d 912 (2d Dist.1994); *Lane* at 449. In assessing whether a misjoinder resulted in prejudice, an appellate court considers (1) whether the evidence of guilt was overwhelming and the effect of any improperly admitted evidence on the verdict; (2) the steps taken to mitigate the effects of the error; and (3) the extent to which the improperly admitted evidence as to the misjoined counts would have been admissible at trial on the other counts. *See Lane* at 450.

{¶110} The majority criticizes my reliance on *Lane* to analyze whether the improper joinder was harmless because the Ohio Supreme Court has adopted the simple-and-distinct test for misjoinder. But the majority is confusing Crim.R. 8 with Crim.R. 14. *Lane* concluded that improper joinder under Crim.R. 8 is not inherently prejudicial and should be reviewed for harmless error. *See Lane* at 449. And Ohio courts have cited *Lane* for that proposition. *See, e.g., State v. Scheibel*, 55 Ohio St.3d 71, 73, 564 N.E.2d 54 (1990).

{¶111} The simple-and-distinct test that the Ohio Supreme Court reaffirmed in *Ford* applies to prejudicial joinder under Crim.R. 14. *See Ford*, Slip Opinion No. 2019-Ohio-4539, at ¶ 104. Moreover, the majority's claim that federal courts have not

adopted the simple-and-distinct test is inaccurate. Federal courts also use the simple-and-distinct test to analyze prejudicial joinder under Fed.R.Crim.P. 14. *See, e.g., United States v. Catena*, 500 F.2d 1319, 1325-1326 (3d Cir.1974), *certiorari denied*, 419 U.S. 1047, 95 S.Ct. 621, 42 L.Ed.2d 641 (1974); *United States v. Lewis*, 547 F.2d 1030, 1033 (8th Cir.1976); *Corbett v. Bordenkircher,* 615 F.2d 722, 725 (6th Cir.1980).

### 1.    The evidence of guilt was not overwhelming.

{¶112}  With respect to the charges related to the traffic stop and the search of Bailey's apartment, the evidence of guilt was circumstantial, as the majority acknowledges. Additionally, Bailey faced the same charges related to the drugs and guns. She resolved the charges by pleading guilty upon reaching an agreement with the state.

{¶113}  Similarly, the evidence against Rosemond with respect to the shootings was not overwhelming. One of the victims testified that Rosemond did not shoot him, and that he was shot by a skinny man in red. Notably, the video shows a skinny man in red in the street, to the right of Rosemond, who appears to be dancing as if he were shooting, and moving towards the victim's car. A second victim did not see any of the shooters.

{¶114}  A third victim, Nared was shot seven times by four different calibers of guns. Initially, he did not implicate Rosemond in the shooting. However, at trial, he testified for the first time that he saw Rosemond standing by the wall after the shooting started. But, the video shows that it was not Rosemond standing by the wall when the shooting started. Instead, it was a man in white tennis shoes standing on the sidewalk by the wall, moving his feet as if he were firing a gun, who then ran down the sidewalk toward Nared.

{¶115} Although Rosemond was visible in the video, he was never seen with a gun. When the shooting started, he ducked next to the driver's side of the white car and was no longer visible. Simultaneously, the skinny man entered the video and appeared to be shooting for the next six seconds. Once the skinny man ran away from the scene, Rosemond again appeared, plodding up the sidewalk next to the white car. Rosemond is a very large man who is 6 feet 2 inches tall and weighs 300 pounds. He does not appear to move very quickly, and it took him a full second to run the length of the white car. Notably, he was not carrying a gun, and his hands were in his pockets.

{¶116} Two seconds after Rosemond ducked behind the white car, four flashes can be seen, but those appear to be coming from the right of the victim's car, which was approximately 54 feet away from where Rosemond ducked behind the car. Three seconds after the flashes stop, Rosemond plodded by the white car. It appears that he had been hiding between the white car and the Honda, because he did not run in front of the headlight of the victim's car.

{¶117} During the shooting, several people called 911 and provided descriptions of the shooters. One of the callers described the suspect as a black male, wearing a brown jacket with fur that left the scene in a white Bronco. Another witness, Teresa, described one shooter as a black male, 30-40, whose nickname was possibly Capone, wearing a brown, puffy coat with a fur collar and standing next to a white SUV. She also described a second shooter as an 18-19 year old male black wearing a red shirt or sweatshirt and dark pants, who fled on foot. According to one witness, the shooters were wearing masks. Another witness stated that three suspects fled on foot. One witness provided the nicknames of four suspects. Yet none of the witnesses who called described Rosemond as one of the shooters.

{¶118} Finally, I am not convinced that Rosemond's statement that Nared was "hit with my shit" was correctly interpreted by the majority. The majority characterized this statement as a joking admission to shooting Nared. However, in a different call where he is discussing the accusations made by the police, he stated, "They hit me with some fake shit." Based on the context of this statement, I cannot conclude that "hit me" refers to shooting.

### 2. The misjoinder resulted in improperly admitted, prejudicial evidence.

{¶119} The evidence against Rosemond was not overwhelming, and it is possible that the jury found him guilty based upon the accumulation of evidence against him concerning the unrelated charges. *See United States v. Cardwell*, 433 F.3d 378, 385 (4th Cir.2005) (explaining that joinder of unrelated charges "create[s] the possibility that a defendant will be convicted based on considerations other than the facts of the charged offense."). Had there been separate trials, very little, if any, of the evidence related to the shootings would have been relevant to the drugs and guns found in the apartment as those particular guns were not related to the shootings. And the evidence related to the drugs and guns would not have been admissible in a trial limited to the shooting charges. The admission of the bad conduct suggested that Rosemond has a general propensity to commit serious and violent crimes which can have a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *Lane,* 474 U.S. at 449, 106 S.Ct. 725, 88 L.Ed.2d 814, quoting *Kotteakos,* 328 U.S. at 776, 66 S.Ct. 1239, 90 L.Ed. 1557.

{¶120} The bad conduct offered in evidence to prove the unrelated offenses certainly had a substantial effect on the jury's verdict. *See, e.g., United States v. Holloway*, 1 F.3d 304, 312, (5th Cir.1993) (concluding that by failing to sever the weapons charge from the unrelated robbery charges, "the jury emphatically was told that

[the defendant] was a bad and dangerous person 'by his very nature', and that a felon who carried a gun was just the sort of character who was most likely to have committed the robberies charged in the indictment."). Here, as in *Holloway*, Rosemond "was unjustifiably tried, at least in part, on the basis of who he was, and not on the basis of the material evidence presented against him." *See id.*

{¶121} The evidence submitted to support the unrelated charges portrayed Rosemond as a violent and dangerous person as evidenced by the prosecutor's remarks that Rosemond "shot up people" and "executed" and "gunned down" the victim in the shooting, and that he was a guy who bought, sold, and used drugs and carried guns. The jury was told that Rosemond was a violent, drug trafficker who possessed guns and was likely to commit all of the charged offenses. *See id.*

{¶122} And the record reflects that the jurors became fearful about their names being publicly released during the course of the trial. During an unrecorded break, the trial court, prosecutor, and defense counsel had a conversation regarding the jurors' concerns regarding the murder case. By agreement, the trial court spoke with the jurors and attempted to allay those concerns. On that same day, the court ordered that all records with personally identifying information about the jurors, including the entirety of the voir dire, be sealed from the public view. The bad-conduct evidence regarding the unrelated charges had a strong impact on the jurors' emotions.

{¶123} Had the offenses not been improperly joined for trial, the jurors would not have heard the prejudicial evidence and may well have acquitted Rosemond of all of the charges.

### 3. The effort to mitigate the prejudicial effect was insufficient

{¶124} The only effort to mitigate the prejudicial effect of the misjoinder was a general instruction to the jurors to consider each count and the evidence applicable to

each separately and to state their findings as to each count uninfluenced by their verdicts on the other counts. Based on this record, one general instruction was insufficient to mitigate the effect of the prejudicial evidence of the misjoined shooting charges. *See United States v. Hawkins*, 776 F.3d 200, 210 (4th Cir.2015), quoting *Lane,* 474 U.S. at 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (concluding that "based on the other two indicia of harmlessness provided in *Lane,* the error in misjoinder affected [the defendant's] substantial rights, and, furthermore, 'had substantial and injurious effect or influence in determining the jury's verdict' despite the limiting instruction.").

{¶125} Accordingly, I would find that the trial court's misjoinder error prejudiced Rosemond, reverse his convictions, and remand for further proceedings.


Please note:

The court has recorded its own entry on the date of the release of this opinion.